STATE of Tennessee, Appellee,

v.

**Randy Dwayne HURLEY, Appellant.**

Supreme Court of Tennessee,
at Knoxville.

April 5, 1993.

Order Granting Petition to Rehear
Aug. 30, 1993.

Opinion on Denial of Rehearing
April 11, 1994.

Suzanna W. Laws, Dandridge and Douglas R. Beier, Morristown, for appellant.

Charles W. Burson, Atty. Gen. & Reporter and Rebecca L. Gundt, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

O'BRIEN, Justice.

Defendant, Randy Dwayne Hurley, appeals from his conviction for first degree murder of Daniel R. "Sarge" West. He was found guilty of premeditated first degree murder, and of felony murder. He was also convicted of armed robbery. He was sentenced to death on each of the murder charges and to a consecutive sentence of 12 years for armed robbery.

On the morning of Friday, 15 April, 1988, the defendant and West left defendant's trailer on 9th Street in Newport, Tennessee, to work on a well at defendant's house in Keener Hollow, off Middle Creek Road, in Cocke County. Sarah Proctor, at that time defendant's girlfriend, arrived at the Keener Hollow location around 4:50 p.m. West and the defendant were still there. Thirty or forty minutes later Proctor left at defendant's request. He asked her to pick him up on Rocky Top, a remote mountain area a short distance away, near the home of defendant's uncle and grandfather. About dusk Proctor picked defendant up at the intersection of Rocky Top and Pond Roads and took him to his trailer on 9th Street in Newport.

Regina (Northern) Hayes, another of defendant's girlfriends, who lived in the 9th Street trailer, testified that defendant arrived at the trailer around dusk on 15 April 1988. He asked her to wash his army jacket for him. She added the jacket to a load of jeans already in the washer. Turning from the washer she noticed he was smiling and inquired about the reason. Defendant replied, " 'Sarge' is dead." He told her that, while he and West were at the Keener Hollow house, he told West "to go for his gun" and "to say his last prayer." When West went for his gun [West customarily carried a .375 Magnum pistol in his truck] defendant "blowed his head off" with a "punkin ball." He also told Hayes that he had gotten "60 something dollars" off West. Defendant in-structed Hayes to tell the sheriff's officers that he had given West $600 and that West had written him a receipt for that amount. Hayes also testified that defendant told her he and Sarah drove West to Rocky Top after he was shot and burned him up in his truck.

On Sunday, 17 April 1988, West's badly charred remains were discovered in his completely burned Toyota truck on a logging road in a desolate area on Rocky Top Mountain. The hands on West's watch had stopped at 8:07 p.m. Dr. Clellan Blake, a State forensic pathologist, testified that he found a single rifle slug called a "punkin ball" with wadding from a shotgun shell in the center of West's brain. The doctor opined that the cause of death was a shotgun wound to the front or front side of the head.

On 19 April 1988 law enforcement officers stopped and questioned Proctor and the defendant in the driveway of the house in Keener Hollow. At this time defendant gave officers a receipt dated 15 April 1988 for $251 received by West from him, and bearing West's signature. On this occasion the officers also found a live .20 gauge shotgun shell in Proctor's purse. The wadding and slug from the shell were similar to that found in the victim's brain. Proctor testified at trial she "assumed" the unfired round was defendant's property. She had earlier claimed it was her father's and had tried to get a friend to say it belonged to him. During a search of defendant's house on 19 April the officers discovered a freshly oiled .20 gauge shotgun.

 Defendant argues two (2) issues collectively saying first the evidence was insufficient to support a conviction under the *Winship*[1] standard on the felony murder count and secondly, that the weight of the evidence was insufficient to support the jury verdict. Defendant's argument is founded on the credibility of the testimony of witness Regina (Northern) Hayes, which he says was severely impaired by evidence of her ill will and threats against him. He points out, correctly, that Hayes testimony is the only evidence of a robbery of the victim. He argues that he was convicted upon circumstantial evidence while conceding that such

---

1. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970).

evidence can be the sole basis for a conviction. His argument on the weak nature of the testimony of Regina Hayes does not survive the rule on the sufficiency of evidence test which applies in this State. The jury heard the testimony of Ms. Hayes as well as that of the defense witnesses who were presented in an effort to impeach her testimony. The weight and credibility of testimony of witnesses, and reconciliation of conflicts in the testimony, are matters entrusted exclusively to the jury as the triers of fact. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984). The jury resolved the issue of Ms. Hayes credibility as to the robbery of the victim as well as the commission of the homicide by their verdict. The issue is without merit.

■ There was other evidence introduced, in addition to that related heretofore, which led unerringly to defendant as the person responsible for the homicide of Dan West. Notwithstanding defendant's insistence to the contrary, the weight of the evidence adduced at trial, was sufficient to support the jury verdict and any reasonable trier of fact could have found guilt beyond a reasonable doubt based upon the evidence in the record. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e).

In conjunction with the foregoing complaint, in reference to the sufficiency of the evidence, defendant submits that the trial court erred in admitting letters from him to his wife which were protected by the marital privilege. He cites several authorities, including Tennessee Rules of Evidence; and T.C.A. §§ 24–1–201, 14–25–106.

Tennessee Rule of Evidence 501, in effect at the time of defendant's trial in May, 1990, states that: Privileges are to be recognized only as provided. The rule sets out that except as otherwise provided by constitution, statute, common law, by these or other rules promulgated by the Tennessee Supreme Court, no person has a privilege to:

(1) Refuse to be a witness;

(2) Refuse to disclose any matter;

(3) Refuse to produce any object or writing; or

(4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

Rule 501 left in place T.C.A. § 24–1–201 which speaks of spousal competency to testify in *civil* actions. Therefore that statute is excluded from our consideration except, so far as the language it contains may assist us in determining the extent of spousal or competency privilege in criminal cases. In pertinent part, the statute provides that a husband and wife shall be competent witnesses, regardless of the disabilities of coverture, though neither husband nor wife shall testify as to any matter that occurred between them by virtue of or in consequence of the marital relation.

T.C.A. § 14–25–106, referred to in defendant's brief, relates to public welfare programs and services for abused persons and is now found at T.C.A. § 71–6–106. It provides for compelled testimony in such cases and has nothing to do with criminal trials. The advisory commission comment to Evidence Rule 501, includes an appendix containing statutes and rules governing privileges. It makes reference to the case of *McCormick v. State*, 135 Tenn. 218, 186 S.W. 95 (1916), for the rule in criminal prosecutions.

Prior to the adoption of the Rules of Evidence, T.C.A. § 40–17–104 provided that in all criminal cases, the husband or the wife were competent witnesses to testify for or against each other. The forerunner of this statute was the Acts of 1915, Chapter 161. Over the years since that time the cases have held that the statute did not abrogate the rule as to privileged, or confidential communications between husband and wife. Generally they have held that neither husband nor wife are permitted, over objection, to testify, in criminal cases, as to any matter occurring between them by virtue or in consequence of the marital relation, nor as to any confidential communications between them. *See McCormick v. State*, supra; *Crane & Co. v. Hall*, 141 Tenn. 556, 213 S.W. 414 (1919); *Cavert v. State*, 158 Tenn. 531, 14 S.W.2d 735 (1929). T.C.A. § 40–17–104 was repealed by Chapter 273, Sec. 33, Public Acts, 1991. The caption to Chapter 273 states that it is an Act to amend various sections of Tennessee Code

Annotated to conform such sections to the Tennessee Rules of Evidence and other rules promulgated by the Tennessee Supreme Court. In view of this it becomes apparent that, at the time of defendant's trial, there was not any constitutional or statutory provision in reference to spousal testimony in criminal cases, leaving us to look to the common law of this State for guidance. A study of the early decisions leaves no other conclusion than that, in company with many of our sister states, Tennessee courts adopted, in criminal cases, a hybrid combination of the ancient common law rule barring interspousal testimony on one hand, and the marital privilege in civil cases, established by statute, on the other.

Prior to the enactment of the *Evidence Amendment Act of 1853* in England, which abolished the testimonial disqualification of husbands and wives,[2] the law was that neither husband nor wife was a competent witness for or against the other. The reasoning being that husband and wife were one. Although there was some discussion of the matter in legal circles about that time, it appears that the English Act of 1853, enacted the first marital privilege legislation to the effect that "no husband shall be *compellable* to disclose any communication made to him by his wife during the marriage, and no wife shall be *compellable* to disclose any communication made to her by her husband during the marriage." (Emphasis supplied). It appears this was an effort to dilute the common law rule and allow voluntary testimony.

The first legislation on the subject of interspousal testimony in this State came with the Acts of 1868, in these words: "That in all civil courts no witness shall be incompetent for the reason that he or she is a party to said cause or may have an interest in the subject matter thereof."

This Act was followed in the year 1869, by legislation holding; "That in all cases, when husband and wife sue or are sued jointly, the wife shall not be held incompetent to testify as to the matter and substance in controversy that transpired while she was a *feme sole* or before marriage, although the husband

may have an interest in the subject matter of the controversy by the marriage."

A third enactment came a few months later in February, 1870, providing: "Sec. 1. That in all civil courts in this State, no person shall be incompetent to testify because he or she is a party to, or interested in, the issue tried."

These statutes, as revised by subsequent amendments, are the foundation of our present T.C.A. § 24–1–201 which applies specifically, by its terms, to civil actions. After the enactment of the foregoing legislation, notwithstanding that there was neither a statutory nor common law precedent for such decisions, the cases involving criminal proceedings in this State consistently have referred to the rule found in *Goodwin v. Nicklin and wife,* 53 Tenn. 256, 6 Heiskell (1871), a civil case in which the Court said: "The common law places the rejection of such evidence upon the high grounds of public policy, and because greater mischief and inconvenience would result from the reception than the exclusion of such evidence. On this account it is a general rule that the husband and wife cannot give evidence to affect each other either *civilly* or *criminally;* for to admit such evidence would occasion *domestic dissensions* and discord . ." (Emphasis, original text). The only authority given for this statement was the comments of a law writer of that period in Sharswood's Starkie Ev., 39.

In *Barker v. James McAuley, et al,* 51 Tenn. 424 (1871), also a civil case, the court stated, "The general rule is well settled, that neither the husband nor the wife, is a competent witness for or against each other, in matters either *civil or criminal,*" citing *Brewer v. Ferguson,* 11 Hum. 566, 30 Tenn. 565, 566 (1851), and also referencing *Starkie,* to the effect that the evidence should be excluded on the grounds of public policy. In *Brewer,* supra, a will contest, the court cited the general rule, without further authority, to be that neither husband nor wife is a competent witness for or against the other, in matters *civil* or *criminal.* (Emphasis supplied).

---

**2.** *See Trammel v. United States,* 445 U.S. 40, 44–45, 100 S.Ct. 906, 909, 63 L.Ed.2d 186 (1980); *J.*

*Strong, McCormick on Evidence,* § 78, p. 293 (4th Ed.1992).

Review of these cases leaves no doubt that such policy as may have been established by common law rule was a creation of the courts, well within our province to modify where reason and experience warrant a departure from the law as it has previously existed. *See Jacob v. State*, 22 Tenn. 372, 388, 3 Hum. 493, 514 (1842); *Dunn v. Palermo*, 522 S.W.2d 679, 688 (Tenn.1975).

The present rule is an anachronism, perhaps suitable for the times in which it was created, but no longer a viable guideline for the conduct of criminal proceedings in a world which has experienced so much change. We consider it timely to establish a policy which is better adapted to the circumstances marked by today's standards.

It is notable that in none of the early enactments dealing with civil litigation, or in any subsequent revision, up to and including the present T.C.A. § 24–1–201, is there any mention of testimony in criminal proceedings. Had that been the intent of the legislature at any time it would have been a simple matter to add the word "criminal" to the language of the Act. The converse is true of Chapter 161, of the Public Acts of 1915, the caption of which was as follows: "An Act to permit the husband or wife to testify for or against each other in all criminal cases in Tennessee. Sec. I—Be it enacted by the General Assembly of the State of Tennessee, that hereafter in all criminal cases in the State the husband or wife shall be a competent witness to testify for or against each other." T.C.A. § 40–17–104, repealed in 1991, contained precisely the same language. Reason dictates that had the legislature intended to exclude any matter that occurred between husband and wife by virtue of or in consequence of the marital relation, that language would have been included in the 1915 Act, or sometime in the intervening 75 years.

■ The movement toward judicial change began in *Adams v. State*, 563 S.W.2d 804, 808 (Tenn.Cr.App.1978), cert. denied 4/10/78, where the court recognized certain conditions which must exist before a communication, including that between husband and wife, might be considered privileged:

(1) The communications must originate in a confidence that they will not be disclosed.

(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

(3) The relation must be one which, in the opinion of the community, ought to be sedulously fostered.

(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

■ We fully endorse the foregoing requirements to be met in order to establish a privileged communication between husband and wife. However, by the adoption of Rule 501 of the Rules of Evidence, the Legislature has removed any barrier to interspousal testimony, for or against one another, in criminal cases, except as provided by common law. We are of the opinion that the common law rule, as it has been stated heretofore, to the effect that public policy requires that neither the husband nor the wife shall be permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation, *McCormick*, supra, p. 228, is too broad a statement when considered in conjunction with the legislative enactments discussed herein. Such a rule does not necessarily promote marital harmony. In this case, defendant invoked the rule of spousal disqualification not for the protection of confidential marital communications, but to exclude evidence of criminal acts with which he was charged. Under these circumstances, the rule is employed more to thwart the system of justice than to promote family peace. *See State v. Freeman*, 302 N.C. 591, 276 S.E.2d 450, 453 (1981). It is difficult to discern how marital tranquility can be sustained by one spouse confiding to the other the circumstances of a criminal act and thus incriminating the other as a conspirator, accessory, or accomplice, according to the circumstances of the offense. In such a situation, the public interest in ascertaining the truth must outweigh any policy to promote marital harmony. In *Trammel*, supra, the Court noted that it hardly seems conducive to the preservation of marital relations to

place a wife in jeopardy solely by virtue of her husband's control over her testimony. That Court concluded that the rule in discussion, similar to the common law expression here, should be modified so that the witness spouse alone has the privilege to refuse to testify adversely. The witness can be neither compelled to testify nor foreclosed from testifying. We agree, that this modification, vesting the privilege in the witness spouse, furthers the important public interest in marital harmony without unduly burdening legitimate law enforcement needs. This exemption against disclosure of a privilege of the particular witness not only conforms to the standards set forth in *Adams*, supra, but is also in consonance' with the privilege reserved in T.C.A. § 24–1–201. Applying this rule under the circumstances of this case, where the wife was a willing witness we find there was no error on the part of the trial court in admitting into evidence letters written to her by defendant. The issue is overruled.

Defendant says the trial judge erred in failing to recuse himself. A pretrial motion for recusal was filed. The basis of the motion was an affidavit signed by the defendant. The affidavit is not included in the record, however the substance of it was read by the trial judge and is included in the transcript. It states that sometime about the years 1976 or 1977 defendant was engaged in selling drugs. One of these transactions involved sale of PCP to an individual named Billy Cooper. Purportedly, the judge's daughter was present and it was defendant's understanding she was to receive some of the illegal drug. The affidavit went on to state that later, "information came to defendant that the judge's daughter had informed him that I had sold illegal drugs to her."

The trial judge said he had never heard of any of this prior to the hearing and despite the allegations in the affidavit he would have no difficulty in assuring that the defendant had a fair and impartial trial. He agreed with defendant's own earlier assessment of the information contained in the affidavit concluding that it was "unimportant." The issue, as we see it, is whether the allegations of the affidavit have so prejudiced the trial judge that he should have recused himself. *See* Tennessee Supreme Court Rule 10, Canon 3(C)(1)(a).

A motion to recuse is addressed to the sound discretion of the trial judge. *In re Cameron*, 126 Tenn. 614, 151 S.W. 64 (1912); *State v. Henderson*, 220 Tenn. 701, 423 S.W.2d 489, 492 (1968). The issue to be determined is not the propriety of the judicial conduct of the trial judge, but whether he committed an error which resulted in an unjust disposition of the case. This case was tried before a jury who determined guilt based upon the evidence presented. Defendant has cited no remarks or actions of the trial judge before the jury, or any expression of opinion, which would infer he favored or was against the defendant. The issue is without merit. *State v. Hawk*, 688 S.W.2d 467, 472 (Tenn.Cr.App.1985).

Equally without merit is defendant's complaint relative to denial of a continuance to allow defense counsel to secure expert testimony relative to the forensic identification of the victim. The gist of this complaint is that during most of the period between the homicide and the trial the defense was relying largely on the fact that the State had not been able to prove the identity of the deceased. The trial of the case began on the morning of Wednesday, 2 May 1990. Preliminary matters, including the voir dire of the jury, took up that full day and the first half of the next day, Thursday, 3 May 1990. Defendant filed and argued a motion for continuance in which it was alleged that on the previous day Dr. Clellan Blake, State pathologist and forensic expert had notified his counsel that the night before he had performed new tests and made forensic comparisons by putting together charred bones of four (4) portions of the jaw and teeth of the victim into a mold and compared it with dental films which had been provided to him. He concluded that in his opinion as an expert in forensic dentistry the victim was Daniel West. Due to the surprise by this evidence and the lack of time to obtain expert services to make comparative tests, defendant insisted a continuance would be necessary.

The trial court denied the motion for continuance on the day of trial because it would

take a minimal amount of time to obtain a dental comparison once an expert was located. He stated it was probable that testimony would not begin for at least a day and to delay the proceedings would stimulate undue publicity. The case had been set three (3) times and there were out-of-state witnesses involved. It was ultimately developed that an investigator from the public defender's office had submitted the evidence to two (2) dentists, practicing in the nearby city of Morristown, who had made positive identification based upon an identical root canal shown on military records and x-rays.

■■■ Disposition of a motion for continuance rests in the sound discretion of the trial court and will not be disturbed absent a clear showing of abuse of discretion. *State v. Butler*, 795 S.W.2d 680, 684 (Tenn.Cr.App. 1990). The party asserting error in the denial of a motion for continuance has the burden of showing prejudice from the denial. *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn.Cr. App.1973). Reversal is not warranted unless an appellate court is convinced that the defendant did not have a fair trial and that a different result might reasonably have been reached if a continuance had been granted. *State v. Butler*, supra, p. 684. Under the circumstances of this case we can find no prejudice to the defendant.

■■■ Defendant says it was error for the trial court to deny him the opportunity to individually voir dire jurors concerning their feelings about the death penalty. He includes in his brief the transcript of the exchange between the trial judge and the jury, specifically five (5) prospective jurors who were excused when they responded that they could not consider the death penalty as punishment. It is insisted that defense counsel was not permitted meaningful examination and an opportunity to rehabilitate jurors opposed to the death penalty, citing *O'Connell v. State*, 480 So.2d 1284 (Fla.1986). *O'Connell* does not stand for the proposition that the preclusion of rehabilitation, per se, is a constitutional violation. The principle issue in that case was that the trial court allowed the State to rehabilitate prospective jurors while denying that privilege to the defendant. This was a violation of due process. Defen-

dant also cites *State v. Harrington*, 627 S.W.2d 345 (Tenn.1981) to sustain his position on this issue. There is very little latitude to be allowed on this question, therefore, rehabilitation is not a viable option. The examination of a prospective juror must show he or she is irrevocably opposed to the imposition of the death penalty, no matter what the evidence might show at trial or that they could not make an impartial decision as to defendant's guilt. The law requires that no juror be excluded for cause from a capital case because of their opposition to the death penalty unless the juror unambiguously admits that he would automatically vote against imposition of the death penalty no matter what the circumstances of the case were. If even one venireman is excluded from the jury on grounds at variance with this standard, then a death sentence imposed by the jury cannot stand. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Harrington v. State*, supra. The record in this case clearly shows that those prospective jurors who were excused for cause were excused in compliance with the standards of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and the cases heretofore cited. There is no merit to defendant's complaint.

■■■ The defendant claims the trial court erred in admitting into evidence a statement given by him to a TBI agent. We find no reason why the evidence should not have been admitted. Defendant insists his statement to Agent Davenport was inadmissible because Davenport did not advise him of his *Miranda* rights nor did he waive his rights before talking to the officer. Davenport testified, during a jury-out hearing, that defendant called him and requested him to come to the Brushy Mountain Prison where he was being held on a parole violation. Defendant said he wanted to talk to Davenport and could not trust anyone in Cocke County. Davenport met with defendant on 9 September 1988 in an interview room at the prison. Davenport did not inform defendant of his *Miranda* rights or obtain a waiver before the conversation began. He stated he had no

intention of interrogating defendant but only went to hear what he had to say. Defendant, who had a criminal record of involvement in selling drugs, asked Davenport's help in getting him out of prison, telling him he must have been set up by Regina Hayes and Bee Fine. He gave Davenport a confidential list of names of people in Cocke County, none of whom were connected with the West murder. The evidence which went before the jury was not actually a statement by defendant, but a redaction of Davenport's out-of-jury testimony, confined to defendant's references to Daniel West's death. He testified that Mr. Hurley stated, in reference to Sarge's death, that he must have been set up by Bee Fine and Regina Hayes. He was telling the agent the truth, and that he and Sarah did not have anything to do with Sarge's killing. Davenport said he asked Hurley why Fine and Northern would set him up, and he stated that they had "a thing going on," and wanted to get rid of him.

The trial court held the statement was admissible on the premise that it was volunteered information. The proof shows that defendant sought out Davenport. Except for the question about Fine and Northern, he did not interrogate defendant, who volunteered this self-serving statement. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), does not apply to these circumstances. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by *Miranda*. Had there been error in the introduction of defendant's response to the agent's question, it would be harmless because this was identical to the defense theory presented at trial.

Defendant also argues that his statement was inadmissible under Tennessee Rule of Evidence 803(1.2), concerning admissions by a party opponent. Rule 803 is not applicable under the facts of this case.

■ Defendant says the admission of evidence taken pursuant to a defective search warrant should have been suppressed. He contends the affidavit to the warrant was fatally defective in that it did not set forth any probable cause for the search of the premises described.

The information contained in the affidavit can be summarized as follows: On 17 April 1988 the remains of the victim were discovered by officers of the sheriff's department at a site approximately one-half mile from the residence of defendant's grandfather. A known law enforcement officer had seen the victim's truck at defendant's 9th Street trailer residence about 9:00 a.m. on 15 April 1988. While attempting to locate the defendant, officers went to a house owned by him on Middle Creek Road. While there they saw a bullet hole and what appeared to be a large blood smear on an outbuilding. At that time the cause of death was thought to be blunt trauma to the head. Based upon this affidavit a search warrant issued for the defendant's Middle Creek Road house to search for blood, hair, tissue, fibers or clothing of the victim and any weapons or ammunition, or any item which could inflict severe blunt trauma to the skull.

It is argued that the affidavit provides no nexus between the place to search and any type of evidence. The observation of the "blood smear" and bullet holes on the outbuilding, the presence of the victim's truck at defendant's trailer and his absence from his usual places of habitation, as well as the discovery of the body in the vicinity of defendant's grandfather's house provided a sufficient nexus and probable cause for issue of the search warrant.

■ Also without merit is defendant's argument that the facts in the affidavit concerning observations at the Middle Creek Road house were the result of an illegal search. The officers had gone to defendant's home to interview him on the premise that he was the last person to see the victim alive. They parked in the driveway between the dwelling and the outbuilding which were about 30 feet apart. When no one responded to a knock on the door they were returning to their vehicle when they observed what appeared to be a bullet hole and blood stains on the outbuilding, located in a place visible to any casual observer. They immediately proceeded to obtain a search warrant. There was no illegal search. *See State v. Byerley*, 635 S.W.2d 511, 513 (Tenn.1982).

Authorities may take note of anything evident to their senses so long as they have a right to be where they are and do not resort to extraordinary means to make the observation.

■ Defendant's further argument is that a .20 gauge shotgun secured in the search under the warrant should have been suppressed because the State could not show that it was the gun used to kill the victim and its probative value was outweighed by its prejudicial effect. There is no merit to this argument. It was determined that West was killed with a projectile from a .20 gauge shotgun shell. Four days after the victim disappeared such a gun was found at defendant's residence, the last place the victim was seen alive. The issue is overruled.

■ Defendant says it was error to allow the State to make improper references about the victim designed to evoke sympathy and which were improperly considered by the jury. The objection applies to the testimony of the victim's daughter, Patricia Ray. She was asked and responded that she was the mother of five (5) children and her father was a retired Sergeant Major who had served 26 years in special forces as a Green Beret.

The initial argument was that the testimony of Ms. Ray was the type of evidence prohibited by the United States Supreme Court in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). In a reply brief he recognizes that the United States Supreme Court overruled *Booth v. Maryland* and *South Carolina v. Gathers* in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). He contends that the State has conceded her statement was designed to evoke sympathy from the jurors and that the evidence constitutes proof of non-statutory aggravating factors presented to enhance the prospect of arbitrary imposition of a capital sentence. Defendant's brief suggests some criticism of the *Payne* decision to the effect that evidence of a victim's personal characteristics are irrelevant to assess the defendant's blame-worthiness and the harm caused by a defendant. The majority opinion in *Payne* held that such

evidence was admissible under the Eighth Amendment to the United States Constitution. It is defendant's position that this nonstatutory aggravation violates the Tennessee Constitution. His ultimate argument is that he was deprived of the opportunity to present in his own behalf evidence relative to the personal characteristics of the victim for the jury's consideration in assessing harm to society.

We find this issue without merit. In the first place the testimony complained of occurred in the guilt phase of the proceedings. Most of it was not relevant to the issues at trial except to establish the length of time the victim had resided in the area. However there was no objection to this testimony, either on direct examination or at the time of the single reference to a "retired military man," in closing argument. Moreover, the evidence complained of does not rise to the level of evidence of nonstatutory aggravation. *See State v. Alley,* 776 S.W.2d 506, 513 (Tenn. 1989); *State v. Miller,* 771 S.W.2d 401, 403 (Tenn.1989).

■ Defendant insists that the United States Supreme Court statement in *Payne,* that "the State cannot challenge the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant," entitled him to offer testimony that would aid the jury in assessing the loss to the community by virtue of the deeds for which he was convicted. We do not read *Payne* to support such a right. Furthermore, defendant never sought to present any such evidence at the sentencing hearing. The episode referred to in the reply brief occurred during the guilt phase of the proceeding when defense counsel sought to elicit testimony from a defense witness that the deceased had engaged her services as a prostitute. Such evidence was irrelevant to any issue at the guilt phase and the trial court properly excluded this information. There is no merit to this complaint.

■ Defendant says the trial court improperly instructed the jury in the sentencing phase of the trial. It is argued that the instructions given unconstitutionally shifted the burden of proof and indicated that the

death penalty was mandatory. He also insists that the verdict form submitted by the jury suffers from a similar defect. A further argument is made that T.C.A. § 39–2–203(f) and (g) provide insufficient guidance to the jury as to the burden of proof concerning whether mitigating factors outweigh aggravating factors and as to the standard of proof to be used in making that decision.

This case was conducted under the sentencing act in existence prior to the 1989 code revision. These matters were addressed in the case of *State v. Boyd*, 797 S.W.2d 589, 595–96 (Tenn.1990), in which the Court said:

"The statute cannot be taken out of context. T.C.A. § 39–2–203(f) integrates and complements sub-section (g) and specifically spells out where the burden of proof lies:

(f) If the jury unanimously determines that no statutory aggravating circumstances have been *proved by the State beyond a reasonable doubt,* or if the jury unanimously determines that a statutory aggravating circumstance or circumstances have been *proved by the State beyond a reasonable doubt* but that said circumstance or circumstances are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment. (Emphasis in original text).

The statute, taken in context, clearly outlines where the burden of proof lies. This argument was rejected in *State v. Thompson*, 768 S.W.2d 239, 251–252 (Tenn.1989)."

■ Defendant submits that he was deprived of constitutional due process and was denied a fair trial. He says he was deprived of these constitutional rights because of the lengthy hours of the trial and the jury deliberations. He points out that after five (5) full days of trial the jury deliberated on Saturday night and Sunday morning. The record does not disclose the exact hours and length of these deliberations. At approximately 7:00 p.m. on Saturday the jury was excused for the night. Inquiry was made of the court to determine if there were facilities available at the motel where they could meet later to deliberate further. They returned

with their verdict on Sunday morning at 9:00 a.m. Defendant relies upon *Hembree v. State,* 546 S.W.2d 235, 242–243 (Tenn.Cr.App. 1976), in which it was held that the trial court erred in not adjourning at midnight when counsel stated they were so fatigued they could no longer be effective, and in permitting the jury to receive evidence until 1:00 a.m. This was held to be a violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sec. 8 of the Tennessee Constitution. No such event took place in this case. The court did not continue over the objections of counsel. The jurors were allowed to deliberate for some unstated period of time at their own request. *See State v. McMullen,* 801 S.W.2d 826 (Tenn.Cr.App.1990). The Court noted that later hours are much less objectionable where, as here, they involve only jury deliberations. There was no error.

■ Defendant poses various reasons to assert that the death penalty was unconstitutionally applied in this case. He first contends that the broad scope of the aggravating circumstances set forth in T.C.A. § 39–2–203(i) does not sufficiently limit the exercise of the jury's discretion and therefore does not adequately limit that population of defendants convicted of first degree murder who are subject to the death sentence. This Court has recently dealt with this issue in *State v. Thompson,* 768 S.W.2d 239, 251 (Tenn.1989), in which the Court noted:

As the Supreme Court has observed, the listed aggravating circumstances serve two (2) functions in our sentencing scheme. *Zant v. Stephens,* 462 U.S. 862, 875, n. 13, 103 S.Ct. 2733, 2742, n. 13, 77 L.Ed.2d 235 (1983). The first is to narrow the class of homicide for which a capital sentence may be imposed. The second is to provide, and in this State to limit, the negative information which the sentencer weighs in the ultimate determination of punishment. In its first function this statute does place the burden on the State to prove one or more aggravating circumstances, and to do so beyond a reasonable doubt. In our view this allocation and standard of proof is constitutionally required at this stage because a convicted person is thereby sub-

jected to a wholly new punishment and because any lesser standard presents an unacceptable risk of error. *Cf. McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

Defendant argues that a death sentence, pursuant to T.C.A. § 39–2–203 is cruel and unusual punishment violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sec. 16 of the Tennessee Constitution. The Court has previously rejected that argument in *State v. Adkins,* 725 S.W.2d 660, 664 (Tenn.1987); *State v. Barber,* 753 S.W.2d 659, 670 (Tenn. 1988); *State v. Black,* 815 S.W.2d 166 (1991).

■■■ Defendant says the statutory scheme requires the exercise of "threshold" discretion in making the determination of matters in aggravation, but, once aggravation is found, the jury's discretion is no longer limited and this limitation is insufficient in the Eighth Amendment sense. The Court dwelt on this issue at length in *State v. Boyd,* supra. We are of the opinion this statute does provide specific guidelines to establish that the burden of proof remains with the prosecution throughout the sentencing process. The United States Supreme Court has noted in *Franklin v. Lynaugh,* 487 U.S. 164, 178–80, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988), that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is not constitutionally required.

■■■ [T.C.A. § 39–2–206] mandates the review of a death sentence by this Court to determine whether the sentence was imposed in an arbitrary fashion. The trial court summarized the facts of the homicide to be that "Mr. Hurley premeditatedly determined to kill Mr. West out of malice. Having determined to kill him he decided to make sport of it, told him to say his prayers and reach for his handgun, at which time he killed him at point blank range with a single shot pumpkin ball from a 20 gage (sic) shotgun. During the course of the killing he robbed him and then burned the body." Our review of the record corroborates that the evidence supports that summary.

The statutory aggravating circumstance found was that the murder was committed while defendant was engaged in committing a robbery. The trial judge found as a significant aspect of the aggravating circumstance that influenced the punishment that "The killing was deliberate, premeditated, willful, and with malice aforethought in the perpetration of robbery and was heinous, atrocious and cruel in that it involved mental torture to the victim." The heinous, atrocious and cruel nature of the killing was in evidence, but was not charged to the jury and not formally found. Our review of the record confirms that the evidence supports the jury's findings of the foregoing aggravating circumstance and that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance found.

We do not find the death penalty to be excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

It is neither necessary or appropriate to catalog prior cases in which the penalty has been death. The facts of this case categorize it as being among the most gross and calloused homicides recorded in recent legal history.

In reference to the nature of the defendant, it was stipulated at trial that the only mitigating factor which applied was statutory factor T.C.A. § 39–13–204(j)(9), requiring the jury to consider any mitigating factor raised by the evidence produced by either the prosecution or defense at either the guilt or the sentencing hearing in respect to defendant's general nature. The trial judge found in his Rule 12 report that there was nothing to mitigate the gravity of the offense or the manner in which it was committed. In his general comments concerning the appropriateness of the sentence he noted that the death penalty is rarely demanded in that circuit and this is only the third time it has been imposed in the past 16 years. He concluded the sentence was appropriate for the reasons stated in his report. We are in accord with that conclusion.

■■■ The State agrees with defendant's contention that two (2) death sentences for the killing of one (1) individual is improper.

We concur with that consensus. Both crimes constitute first degree murder. T.C.A. § 39–2–202 provides alternate means by which the offense may be committed. There was only one first-degree murder, and there should be only one punishment. Therefore, we affirm the conviction for premeditated first degree murder and for armed robbery. The conviction for felony murder is vacated and set aside. The jury unanimously found as a statutory aggravating circumstance that the murder was committed while the defendant was engaged in committing or attempting to commit a robbery, and fixed the punishment for defendant at death by electrocution for the offense of murder in the first degree.

The trial judge imposed a sentence of twelve (12) years for armed robbery and sentenced the defendant to death on each of the murder convictions. We modify the judgment to impose one death sentence for premeditated first degree murder and dismiss the felony murder count. We affirm the judgment of the trial court as modified. The death sentence will be carried out as provided by law unless otherwise stayed or modified by appropriate authority. Costs are assessed against the defendant.

DROWOTA and ANDERSON, JJ., concur.

REID, C.J., files a separate dissenting opinion, joined by DAUGHTREY, J.

REID, Chief Justice dissenting.

I dissent. In my opinion, the evidence does not establish premeditation and deliberation or that the murder was committed during the course of a robbery, and as a result, the proof shows no offense greater than second degree murder. The jury found the defendant guilty of premeditated murder, felony murder, and armed robbery. The majority, arbitrarily, so far as the opinion discloses, affirms the premeditated murder conviction and reverses the felony murder conviction. The majority also finds evidence to support the aggravating factor that the murder was committed in the course of a robbery.

The evidence on which the defendant was convicted and sentenced to death is entirely circumstantial. It consists of the testimony of Regina Hayes, one of four witnesses described in the record as the defendant's girlfriend. The record also shows he married the witness Sarah Proctor while he was in jail awaiting trial. The convicting evidence was Hayes's testimony that, upon returning to the trailer she and the defendant occupied, the defendant told Hayes, "Sarge is dead," he told the victim "to go for his gun" and "to say his last prayer," and then he "blowed his head off." According to Hayes, the defendant also told her that he got "sixty-something dollars" off the victim. Taken as true, this evidence is sufficient to establish the malicious intent necessary to a conviction for second degree murder. But, without more, it is not enough to prove the necessary elements of first degree murder, i.e. premeditation and deliberation. There is no evidence of what precipitated the incident that led to the victim's death. The day the victim was killed, the defendant and the victim had worked together on a well at a house owned by the defendant. There is no evidence of animosity or differences between the defendant and the victim and no other evidence as to the circumstances under which the defendant was killed. The Court can only speculate as to how the killing occurred, but speculation, of course, is not a substitute for proof. *State v. West,* 844 S.W.2d 144, 148 (Tenn. 1992).

The majority casts the issue as one of credibility and disposes of that assignment with the observation that the jury by its verdict decided against the defendant. The issue is not credibility at all, but sufficiency of the evidence. There is no evidence on which the jury could find premeditation or deliberation. The trial judge's summary of the incriminating evidence, quoted and approved in the majority opinion, is not proof and is not established by the evidence. The evidence, given its most incriminating meaning, shows nothing more than a John Wayne "go for your gun, pardner" and a resulting shoot-out. The evidence, though circumstantial, points to the defendant as the person who shot the victim, as the majority observes. It does not, however, prove first degree murder.

The State is not entitled to a presumption that a homicide is first degree murder. Indeed, if a killing is shown to be malicious and intentional, the law presumes that the offense is second degree murder, and in order to elevate the offense to first degree murder, the State must prove, beyond a reasonable doubt, that the killing was "by means of poison [or] lying in wait," or with deliberation and premeditation. T.C.A. § 39–2–202(a) (1982); *State v. Brown*, 836 S.W.2d 530, 543 (Tenn.1992); *Witt v. State*, 46 Tenn. 5, 8 (1868), *overruled on other grounds, Campbell v. State*, 491 S.W.2d 359, 362 (1973); *Bailey v. State*, 479 S.W.2d 829, 833 (Tenn.Crim. App.1972).

Even if the killing was premeditated, there is insufficient evidence that it was, in the language of T.C.A. § 39–2–203(i)(7), "committed *while* the defendant was engaged in committing ... or was attempting to commit" a robbery. (Emphasis added.) Robbery may have been the motive for the killing or the statement that he "got sixty-something dollars off Sarge" may have referred to some act unrelated to the shooting. The record simply does not establish that a robbery was accomplished. In order to convict on circumstantial evidence alone, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 613 (1971). This standard of proof is required as to each element of the offense. *Hardin v. State*, 210 Tenn. 116, 355 S.W.2d 105, 107–8 (1962).

I also disagree with the majority's modification of the law of privileged communication between husband and wife. The majority finds that the common law rule in Tennessee is "an anachronism," and justifies its abrogation with the assertion that "the public interest in ascertaining the truth [in a criminal case] must outweigh any policy to promote marital harmony." This "timely" rule, found by the majority to permit letters from the defendant to his wife to be admitted into evidence, stands in stark contrast to the rule heretofore honored by this Court. The policy consideration on which the rule has rested for centuries is well-stated in *McCormick v. State*, 135 Tenn. 218, 225, 186 S.W. 95 (1916):

"No public policy is sound which, in the name of public justice, invades the home and takes therefrom the wife as a witness against the husband, or the husband against the wife, and by means of the evidence of one consigns the other to the gallows, the penitentiary, or the jail. An increased number of convictions might result from such a policy, but at a cost which the public could ill afford. The home is the sanctuary of our civilization, and the increased number of convictions would not compensate for the homes destroyed."

*Id.* at 225, 186 S.W. at 96 (quoting *Norman v. State*, 127 Tenn. 340, 355, 155 S.W. 135 (1912)). I would hold that the public welfare is better served by promoting marital harmony. It should be noted that upon the reduction of the offense to second degree murder, admission of the evidence would be harmless error beyond a reasonable doubt and would not require reversal of the conviction.

The majority's comments regarding proportionality demonstrate a disturbing misunderstanding or disregard of the duty imposed upon this Court with regard to the review of capital cases. The statement that "It is neither necessary or appropriate to catalog prior cases in which the penalty has been death" disregards the plain meaning of T.C.A. § 39–13–206(c)(1)(D) and even the prior decisions of this Court, which, at least, have recognized the duty. *State v. Harris*, 839 S.W.2d 54, 77 (Tenn.1992) *cert. denied* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993) ("We have reviewed Rule 12 reports from trial judges submitted over the past fourteen years in all criminal trials for first degree murder in which life imprisonment or a sentence of death has been imposed.") The majority merely restates the basis on which it concludes that the evidence supports the conviction, and even that recitation relies upon the trial judge's unsupported summary of the evidence. As stated above, there is no evidence in the record of premeditation or deliberation. The trial court's statement that the defendant "ha[d] determined to kill him" is blatantly conclusory, as

is the statement that "during the course of the killing he robbed him." The majority's conclusion that "our review of the record corroborates that the evidence supports that summary" is equally without basis. The opinion then relies upon an aggravating circumstance gratuitously supplied by the trial judge to the effect that the crime "was heinous, atrocious, or cruel," (T.C.A. § 39–2–203(i)(5) (1982)) even though that aggravating circumstance was not submitted to the jury and, of course, was not found by the jury. The circumstances of this killing, to the extent they are known, hardly place it "among the most gross and calloused homicides recorded in recent legal history."

The proportionality review required by T.C.A. § 39–13–206(c)(1)(D) and determined by state and federal law to be critical in death penalty jurisprudence consists in this case of nothing more than the statement: "We do not find the death penalty to be excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." As a mandated final protection of constitutional rights, this review is an abdication of judicial responsibility.

I am authorized to say that Justice DAUGHTREY joins me in this opinion.

### ORDER ON PETITION TO REHEAR

[Filed Aug. 30, 1993]

PER CURIAM.

A Petition to Rehear has been filed by defendant in this cause asserting that the Court's opinion is in conflict with the rule regarding proof of premeditation and deliberation enunciated in *State v. Brown*, 836 S.W.2d 530 (Tenn.1992) and *State v. West*, 844 S.W.2d 144 (Tenn.1992).

The Court is of the opinion that rehearing is appropriate, limited to two (2) issues:

(a) The sufficiency of the evidence to sustain the conviction of premeditated first degree murder and felony murder.

(b) Our adoption of the rule vesting the confidential marital communications privilege in a criminal proceeding on the witness spouse rather than the accused.

The petition to rehear is granted. The petitioner shall have 15 days from the date of entry of this order in which to file his brief. The State shall have 15 days thereafter in which to respond. Oral argument will not be allowed.

### OPINION ON PETITION TO REHEAR

[Filed April 11, 1994]

O'BRIEN, Justice.

A petition to rehear has been filed by defendant in this case asserting that the Court's opinion is in conflict with the rule regarding proof of premeditation and deliberation enunciated in *State v. Brown*, 836 S.W.2d 530 (Tenn.1992) and *State v. West*, 844 S.W.2d 144 (Tenn.1992).

The petition was granted to consider the sufficiency of the evidence to sustain the conviction of premeditated first degree murder and felony murder, and, because the issues are connected, our adoption of the rule vesting the confidential marital communications privilege in a criminal proceeding in the witness spouse rather than the accused.

The defendant cites from both *Brown* and *West*, supra, for the premise that the law in Tennessee has long recognized that once the homicide has been established it is presumed to be murder in the second degree. The State bears the burden of proof on the issue of premeditation and deliberation sufficient to elevate the offense to first-degree murder; and that the element of premeditation requires a previously formed design or intent to kill. Deliberation on the other hand, requires that the killing be done with a cool purpose ... in other words, that the killer be free from the passions of the moment. Moreover, the fact that "premeditation can be formed in an instant" must be viewed in contrast to the element of deliberation, which obviously cannot be formed instantaneously.

We note at the outset that this Court vacated and set aside the conviction for felony murder. The Court held that the weight of the evidence adduced at trial was sufficient to support the jury verdict of first degree murder beyond a reasonable doubt, based on the evidence in the record. It is true, as

defendant insists, that, except for his admission to Regina Hayes that he had "blown the victim's head off with a punkin ball," that the evidence against him was largely circumstantial. However, there were numerous inferences for the jury to draw from the other evidence in the record. Hayes' testimony that defendant and Sarge West left defendant's 9th Street trailer in separate vehicles was somewhat equivocal, but probative. Sarah Proctor, was indicted as an accomplice after the fact of the homicide. She was not yet married to the defendant and her in-court testimony was admissible. She testified she came to the Middlecreek Road residence late in the afternoon on 15 April 1988. Both defendant and West were present. Defendant asked her to pick him up on Rocky Top where the victim's body was later found burned in his truck. She says she picked him up about dusk dark and delivered him to the trailer on 9th Street. Her testimony conformed to that of Regina Hayes concerning the time he arrived there. Defendant instructed Proctor to tell officers that on the day of the homicide West had left the house on Middlecreek Road and that she and the defendant remained there together for the rest of the evening. On 19 April 1988 law enforcement officers stopped and questioned Proctor and the defendant in the driveway of the house on Middlecreek Road. At this time the defendant gave officers a receipt for $251 received from the defendant and signed by Daniel R. West, dated April 15, 1988. The officers found a live .20 gauge shotgun shell in Proctor's purse. The wadding and slug from this shell were similar to that found in the victim's brain. Proctor testified she "assumed" the unfired round was the property of the defendant. She had earlier claimed it was her father's and also tried to get a friend to say it belonged to him. Officers found an assortment of 10 long guns in the defendant's house including a .20 gauge shotgun. This shotgun was the only one among the weapons found which had been freshly oiled and cleaned.

Defendant and Sarah Proctor were married on 7 June 1988 while he was in prison. On June 18th Proctor's father gave to the authorities an undated letter to his daughter from the defendant in which he wrote, "Sarah, about the Sarge man, please don't turn on me now. Just stick with your and my story we already told everybody, okay?" In another letter he asked Proctor to write a letter to him saying she had killed West. She wrote the letter and even told some people that she had shot West after he had tried to rape her. Proctor also testified that she heard defendant tell his son that the victim's gun was buried on Rocky Top on his uncle's land, although this was denied by the son.

Defendant presented an alibi defense. One female witness testified she had met him on Rocky Top after Sarah Proctor had left the Middlecreek Road house. She subsequently recanted that statement. Another female testified that defendant had been at her home from 8:00 p.m. on April 15th until the next morning. Defendant presented testimony that Regina Hayes was jealous of his relationship with Sarah Proctor and had threatened to get him and to have Clifford "Bee" Fine "fix" defendant. Another female witness testified she had seen Dan West on April 15th at 8:30 p.m. on the sidewalk in downtown Newport.

In *Brown, supra* at p. 539, the Court said, "In order to establish first-degree murder, the premeditated killing must also have been done deliberately, that is, with coolness and reflection." In *State v. West, supra* at p. 147 the Court remarked that it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill. We are satisfied that the evidence in this case was abundantly sufficient to establish the elements of premeditation and deliberation so as to warrant the jury's guilty verdict.

■ We elected for two (2) reasons to reconsider our adoption of the rule vesting the confidential marital communications privilege in a criminal proceeding in the witness spouse rather than the accused. First, we profess to an error in the statement in the opinion that, "at the time of defendant's trial, there was not any constitutional or statutory provision in reference to spousal testimony in criminal cases, leaving us to look to the common law of this State for guidance." Defen-

dant's trial took place in May 1990. T.C.A. § 40–17–104 was repealed by the Public Acts of 1991, Ch. 273, § 33. Thus, defendant's wife was a competent witness against him under the statute, notwithstanding the common law dictates of *Brewer v. Ferguson, supra; Barker v. James McAuley, supra; Goodwin v. Nicklin, supra,* basing the common law rejection of spousal testimony upon the grounds of public policy. These cases were the predecessors of *McCormick v. State, supra,* which is commonly referred to as the "watershed of the policy."

To recapitulate, as stated by one text writer,[1] We are dealing here with a late offshoot of an ancient tree, involving three (3) rules. First, the rule that the spouse of a party or person interested is disqualified from testifying for the other spouse. Second, the privilege of a party against having the party's husband or wife called as an adverse witness. Third, the privilege presently under discussion, testimonial communications between spouses gained in the course of the marital relationship. The enactment of Tennessee Rules of Evidence 501 and 601 have effectively abrogated any statute or rule in Tennessee disqualifying spouses as witnesses for or against one another except for the marital privilege. The rule against adverse spousal testimony was abolished on a federal level by the United States Supreme Court in *Trammel, supra.* Insofar as can be ascertained this disqualification never existed in Tennessee unless it might be classified as being inclusive under *McCormick v. State, supra.*

In the *McCormick* case, after reviewing a number of cases which preceded the enactment of Ch. 161 of the Acts of 1915, the Court undertook the task of deciding whether or not, after the passage of the Act, a husband or wife would be permitted, over objection, to testify in criminal cases, as to any matter that occurred between them by virtue or in consequence of the marital relation, or as to any confidential communications between them. They reviewed two (2) cases from the State of Florida, as well as some general texts on the subject and expressed the opinion that while Ch. 161 of the Acts of 1915 made a husband or wife a competent witness to testify for or against each other in all criminal cases, it did not abrogate the rule as to privilege or confidential communications. The Court concluded that sound public policy required that neither the husband nor the wife should be permitted to testify, in criminal cases as to any matter coming to his or her knowledge by reason of the marital relation on the premise that the sacredness of the home and the peace of families can only be preserved and protected by enforcing this long-established rule of the common law.

Accepting the existence of the rule and the soundness of the public policy by the *McCormick* court in its 1916 decision, under the evolving conditions existing in today's world we see no reason why an innocent spouse should suffer the risk of personal incrimination by having a miscreant marriage partner divulge acts of criminal conduct with the expectation that this information would remain secret. We are satisfied that the modification of the rule to vest the privilege in the testifying spouse is appropriate.

As the *Trammel* court noted, when one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve. In these circumstances a rule of evidence that permits an accused to prevent adverse spousal testimony seems far more likely to frustrate justice than to foster family peace.

The petition to rehear is denied.

REID, C.J., and DROWOTA and ANDERSON, JJ., concur.

DAUGHTREY, J., not participating.

---

1. *McCormick on Evidence,* supra at note 2.