# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

## MAY 1999 SESSION



**FILED**

**June 15, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | **C.C.A. NO. 02C01-9808-CC-00243** |
| Appellee, | ) | |
| | ) | **FAYETTE COUNTY** |
| VS. | ) | |
| | ) | **HON. JON KERRY BLACKWOOD,** |
| KENNATH ARTEZ HENDERSON, | ) | **JUDGE** |
| a/k/a GOOSE | ) | |
| | ) | |
| Appellant. | ) | (First-Degree Murder---Death Penalty) |

FOR THE APPELLANT:          FOR THE APPELLEE:


**C. MICHAEL ROBBINS**                **PAUL G. SUMMERS**
46 North Third St., Suite 719        Attorney General & Reporter
Memphis, TN 38103
     (On Appeal)                      **TONYA MINER**
                                     Asst. Attorney General
**MIKE MOSIER**                          John Sevier Bldg.
P.O. Box 1623                        425 Fifth Ave., North
204 West Baltimore                   Nashville, TN 37243-0493
Jackson, TN 38302
    -and-                            **ELIZABETH T. RICE**
**ANDREW S. JOHNSTON**                   District Attorney General
108 East Court Square
Somerville, TN 38068                 **JAMES W. FREELAND**
     (At Trial)                       Asst. District Attorney General
                                     302 Market St.
                                     Somerville, TN 38068

OPINION FILED:_____


**AFFIRMED**


**JOHN H. PEAY,**
Judge

**O P I N I O N**

The defendant pled guilty to first-degree premeditated murder, two counts of especially aggravated kidnapping, aggravated robbery, attempted especially aggravated kidnapping, aggravated assault, and felonious escape. The defendant also waived his right to jury sentencing. After a capital sentencing hearing, the trial court imposed the death sentence for the murder count and an effective sentence of twenty-three years in prison for the noncapital offenses. The only issue the defendant raises for appeal is whether the imposed death penalty is comparatively disproportionate. Finding no merit to the defendant's argument, we affirm.

The material facts underlying the offenses, which occurred on May 2, 1997, are not disputed. According to the record, the defendant was serving time in jail for two prior charges, including felonious escape. Sometime in April 1997, the defendant convinced a friend to smuggle a pistol to him in jail. In late April 1997, the defendant requested permission for dental work, and an appointment was made for May 2 with Dr. John Cima, a local dentist who treats inmates and had previously treated the defendant. On the morning of May 2, the defendant dressed in two layers of clothing and concealed the smuggled pistol on him. Deputy Sheriff Tommy Bishop, a uniformed police officer, transported the defendant and another inmate, Deloice Guy, in a marked police car to Dr. Cima's office. As a transportation officer, one of Deputy Bishop's jobs was to transport inmates from the jail to Dr. Cima's office. According to the testimony, Deputy Bishop always treated prisoners "right," in a gentle manner and with respect; it was not his custom to shackle or handcuff inmates during transport. On May 2, neither he nor Ms. Guy was shackled or handcuffed.

After arriving at Dr. Cima's office, the defendant and Ms. Guy were taken

2

to separate treatment rooms. Deputy Bishop remained in the front reception room talking with the receptionist while Dr. Cima and his assistant administered shots to the inmates to numb their mouths. When Dr. Cima and his assistant entered the defendant's treatment room to begin treatment, the defendant pointed his pistol at them. Dr. Cima grabbed for the pistol, and a struggle began. In the process, Dr. Cima yelled for Deputy Bishop's help. Deputy Bishop responded and was shot by the defendant near the doorway of the treatment room. The bullet pierced Deputy Bishop's shoulder, causing him to hit his head against a door frame and land face down and, most likely, unconscious from the fall. This gunshot wound was not itself fatal.

The defendant yelled for Ms. Guy and the receptionist. Ms. Guy remained hidden in her treatment room, but the receptionist obeyed the defendant's orders and went to his treatment room. Standing three feet from the defendant, she witnessed him shoot the motionless Deputy Bishop in the back of the head at close range. The defendant took Deputy Bishop's gun, pointed his pistol at Dr. Cima and his assistant, demanded Dr. Cima's truck keys, credit card, and money, and ultimately ordered Dr. Cima and the receptionist to accompany him outside. Once outside, the defendant was startled by another patient, which allowed Dr. Cima and the receptionist to escape and call the police. Meanwhile, the defendant left the premises in Dr. Cima's truck. He began speeding when police officers pursued him. Even though the road on which he was traveling ended in a series of fields, the defendant continued driving off-road. Three fields later, he was finally apprehended when he wrecked Dr. Cima's truck in a ditch near a fenced tree line. The murder weapon, Deputy Bishop's gun, and the personal items taken from Dr. Cima were found in the truck.

After the defendant's apprehension, it was discovered he had shot himself

3

in his thigh, apparently as a result of a misfire.[1] The bullet from this shot traveled through the floor, lodging itself in the dirt beneath the dentist's office. The forensic evidence also established that the bullets used could have easily penetrated the thin walls in the dentist's office.

According to the defendant's testimony at the sentencing hearing, the defendant was a twenty-four-year-old high school graduate and lifelong resident of Fayette County. The oldest of five sons, the defendant received various academic awards throughout school, was involved in sports and other extracurricular activities, and has exhibited artistic talent. He expressed remorse for his actions, and he stated he had had "problems" in high school that had remained unaddressed. When his high school principal approached his mother about these "problems," she did not believe there was cause for concern. The defendant also testified that when he was in jail in Arkansas for a prior offense, he asked the sheriff for "help psychologically," but nothing was ever done. According to the defendant's mother's testimony, she recalled the defendant asking for help while in an Arkansas jail, but because he "seemed to be doing fine" when she talked with him, she never pursued the matter.

Dr. Lynne Zager testified as a defense expert in psychology. Because the defendant did not have a prior mental health history, she based her opinions solely on her two interviews with the defendant, the results of a personality test she administered to the defendant, and information provided by the defense team. At her first interview with the defendant, the defendant expressed that he felt the events surrounding the murder and other crimes were "like a dream happening." At her second interview with the defendant, she concluded that the defendant exhibited some antisocial and narcissistic personality

---

[1]The forensic evidence indicated that the gun was discharged from within the defendant's trousers, indicating that it fired (presumably by accident) when he attempted to put the gun in his waistband.

4

traits. She also concluded that the defendant had been in duress, defined as a dissociative state, from the time he fired the first shot until approximately twenty-four hours after the murder. According to Dr. Zager, a person in a dissociative state would feel like he or she was in a dream and may not be fully aware of events as they happened, which would also explain why the defendant did not realize he had shot himself in the thigh until the day after the murder and would have only a patchy memory of what occurred. Dr. Zager affirmed that this was only the second time the defendant had fired a weapon, and she testified that it was not unusual for police officers, soldiers, and others trained as marksmen to enter a dissociative state the first time they shoot someone. Dr. Zager declined to express an opinion whether the defendant was aware at the time it happened that he was killing Deputy Bishop by firing a second shot into the back of his head. She also testified she did not believe that the defendant was insane or that his mental condition was substantially impaired at the time of the crimes. She was, however, "really impressed with [the defendant's] sincere expression of regret and sorrow."

Based on this evidence, the trial court found four aggravating circumstances: (1) that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the murder; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; (3) that the murder was committed while the defendant was in lawful custody or in a place of lawful confinement or during the defendant's escape from lawful custody or from a place of lawful confinement; and (4) that the murder victim was a law enforcement officer engaged in the performance of his official duties and that the defendant knew him to be a law enforcement officer engaged in the performance of his official duties. See T.C.A. § 39-13-204(i)(3), (6), (8), (9) (Supp. 1998). The trial court further found that these aggravating circumstances outweighed any mitigating

5

circumstances[2] and imposed the death sentence.

The defendant now argues that a death sentence is a disproportionate penalty when compared to the penalty imposed in similar cases. A death sentence will be considered disproportionate if when taken as a whole, the case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed." State v. Bland, 958 S.W.2d 651, 665 (Tenn. 1997). A sentence of death, however, is not disproportionate merely because the circumstances are similar to those in another case in which a defendant received a life sentence. State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). The appellate court's role in conducting comparative proportionality review is to assure "that no aberrant death sentence is affirmed," not to assure that a sentence "less than death has never been imposed in a case with similar characteristics." Id.

In choosing similar cases to compare, many variables are considered, including the following: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances, including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667. Also relevant are the similarities between the defendant in the case under review and the defendant in other death penalty cases, including the following: (1) prior criminal record or activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional, or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's

---

[2]Although defense counsel argued that several mitigating circumstances should apply, see T.C.A. § 39-13-204(j)(1), (2), (6)-(8)(Supp. 1998), the trial court did not enumerate the mitigating circumstances (if any) it found to exist in this case. The defendant does not challenge the trial court's failure to make specific findings regarding mitigating circumstances.

cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim; and (8) the defendant's capacity for rehabilitation. Id.

Comparative proportionality review is not a rigid, objective test. Id. at 668; Hall, 958 S.W.2d at 699. The appellate court does not "employ mathematical or scientific techniques." State v. Smith, ___ S.W.2d ___ (Tenn. May 17, 1999). Rather, in using the enumerated factors to compare the circumstances of this case to other death penalty cases, a reviewing court must rely upon "the experienced judgment and intuition of its own members." Bland, 958 S.W.2d at 668.

Here, the defendant, a seemingly bright, educated, and talented black male in his early twenties, calculated the events that led to the murder of Deputy Bishop. In apparent contemplation of an escape from prison, the defendant arranged for an off-premises dental appointment, procured a weapon, and wore two sets of clothing on the day he planned to escape. He wielded a gun, pointing it at several people and endangering their lives, and when Deputy Bishop came to their aid, he was immediately shot and likely rendered unconscious. Deputy Bishop lay motionless on the floor, and even though he was no longer an obstacle to the defendant's escape, the defendant shot him again, in the back of the head at close range, killing him. The defendant then seized the deputy's weapon, took two people hostage, and ultimately escaped by stealing a truck, stopping for the authorities only when circumstances left no alternative. According to his expert witness, he may have been in a dissociative, "dream-like" state at the time he murdered Deputy Bishop, which caused him to have only a patchy memory of what occurred.

In State v. Workman, 667 S.W.2d 44 (Tenn. 1984), the defendant was apprehended by four police officers after robbing a fast food restaurant. In his attempt

to escape custody, he shot and killed one of the officers. Id. at 46. Like the defendant in the instant case, Workman claimed to remember only "'bits' and 'pieces'" of the events, although Workman blamed his faulty memory on drugs while the defendant's apparently poor memory here is attributed to a dissociative state. Id. at 47. At any rate, the same four aggravating factors that were found in the instant case were also found in Workman, and the death penalty was imposed and upheld. Id. at 47-48; cf. State v. Burns, 979 S.W.2d 276 (Tenn. 1998)(the finding of only one aggravating circumstance, that the defendant created a great risk of death to two or more people by firing multiple shots into a car carrying several unarmed men, justified the imposition of the death sentence for a twenty-three-year-old defendant).

Other cases with similar circumstances also indicate that the death penalty is not disproportionate in this case. In State v. Taylor, 771 S.W.2d 387 (Tenn. 1989), the twenty-one-year-old defendant, a prison inmate who killed a prison guard, received the death sentence despite evidence he had a history of mental illness and suffered from a psychotic episode at the time of the killing. In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), the nineteen-year-old defendant received the death penalty after killing her victim in the same manner the defendant here killed Deputy Bishop, that is, by disabling the victim with one shot and then again shooting her in the head as she was lying on the floor. See State v. Hurley, 876 S.W.2d 57 (Tenn. 1993)(death penalty upheld for defendant who killed victim in perpetration of a robbery by a single shot to the head); State v. Cooper, 718 S.W.2d 256 (Tenn. 1986)(death penalty upheld for defendant who killed his wife while she was trapped in a small, enclosed booth by firing once at her, walking away, and returning to shoot her four times); State v. King, 694 S.W.2d 941 (Tenn. 1985)(death penalty imposed for thirty-two-year-old defendant who killed tavern owner with a single shot in the neck during a robbery while owner was on the floor, as the defendant ordered).

Of course, no two cases are identical, but these cases share several similarities with the instant case. Although there may be cases in which a life sentence has been imposed for similar or more atrocious murders, this does not render the death penalty in this case disproportionate. Smith, ___ S.W.2d at ___. Our review of this case in conjunction with other similar cases convinces us that the death penalty in this case is not disproportionate to the penalty imposed for similar crimes in other cases. Accordingly, the trial court's judgments are affirmed.

_____
JOHN H. PEAY, Judge

CONCUR:

_____
JOE G. RILEY, Judge

_____
THOMAS T. WOODALL, Judge