IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 5, 2000 Session

## STATE OF TENNESSEE v. GERALD L. POWERS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 96-08230 & -08231     Joseph Dailey, Judge**

---

**No. W1999-02348-CCA-R3-DD - Filed September 28, 2001**

---

The Defendant, Gerald L. Powers, was convicted by a jury of first degree felony murder in the perpetration of a robbery and of aggravated robbery. The jury sentenced the Defendant to death for the murder on the basis of three aggravating circumstances: that the Defendant was previously convicted of one or more violent felonies; that the Defendant committed the murder to avoid his arrest and/or prosecution; and that the Defendant committed the murder while committing a kidnapping. The trial court subsequently sentenced the Defendant as a Range III persistent offender to thirty years incarceration for the aggravated robbery, to be served consecutive to the death sentence. In this appeal as of right, the Defendant challenges his convictions, raising the following issues: (1) whether the evidence identifying him as the perpetrator is sufficient; (2) whether a variance between the indictment and the proof at trial is material and prejudicial; (3) whether the trial court had jurisdiction over the crimes; (4) whether the Defendant's wife's testimony should have been suppressed pursuant to the marital communications privilege; (5) whether the trial court erred in refusing to admit evidence in support of a third-party defense; (6) whether the trial court erred in admitting a lay witness's testimony identifying photographs as being of the Defendant; and (7) whether the trial court erred in admitting a deposition taken in Mississippi by a Tennessee notary public. The Defendant challenges the imposition of the death sentence on the following grounds: (1) whether the trial court erred in admitting the facts underlying the Defendant's prior felonies; (2) whether the Defendant's prior felonies were violent within the meaning of the statutory aggravating circumstance; (3) whether the evidence is sufficient to support the jury's finding that the Defendant committed the murder to avoid his arrest and/or prosecution; (4) whether the trial court erred in refusing to admit evidence of the victim's bad character; and (5) whether Tennessee's death penalty scheme is constitutional. Finally, the Defendant contends that the trial court should have sentenced him as a Range II offender for the aggravated robbery. Upon our review of the record and relevant legal authority, we find no reversible error in the Defendant's convictions or in the imposition of the death sentence. We reduce the Defendant's sentence for the aggravated robbery to twenty years. In all other respects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

W. Mark Ward, Assistant Public Defender, (on appeal), Memphis, Tennessee; Tony N. Brayton, Assistant Public Defender, (on appeal), Memphis, Tennessee; Garland Erguden, Assistant Public Defender, (on appeal), Memphis, Tennessee; Loyce Lambert-Ryan, Assistant Public Defender, (at trial), Memphis, Tennessee; and Larry H. Nance, (at trial), Memphis, Tennessee, for the appellant, Gerald Powers.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; William L. Gibbons, District Attorney General; Amy P. Weirich, Assistant District Attorney General; and Jerry R. Kitchen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTS:  GUILT PHASE

On the evening of April 18, 1996, the victim, Shannon Sanderson, and her husband, Robert Sanderson, planned to celebrate Mr. Sanderson's birthday by visiting Tunica, Mississippi.  When Mr. and Ms. Sanderson had an argument, Ms. Sanderson left by herself.  She drove to Tunica and visited Sam's Town Hotel & Gambling Hall, where she won $5,000.  At about three in the morning on April 19, 1996, Ms. Sanderson cashed in her chips and received $5,000 in one hundred dollar bills.  She placed the money in her purse and was escorted to her car.  Ms. Sanderson then drove to her former father-in-law's house in Memphis, Tennessee to pick up her three children.

Edward Holland, Ms. Sanderson's former father-in-law, testified that he was awakened at about 4:45 a.m. on April 19, 1996 by dogs barking.  He looked outside and saw Ms. Sanderson.  He testified that it looked like she was beside her car, bent over.  He heard her say, "don't -- don't" and thought she was talking to her husband.  He did not see anyone other than Ms. Sanderson.  He got dressed and went outside, but couldn't find her, although her car remained in the driveway.  He spoke with his neighbor, William Dillon, who was also outside.  Mr. Holland testified that Dillon told him that a man had Ms. Sanderson on the ground, that she was screaming and "hollering", and that he forced her into the back of a car.

William Dillon, who lived next door to Mr. Holland, testified that he was awakened at about 4:45 a.m. by dogs barking.  He got up and "hollered" at his dog.  The motion detector lights around his house turned on, and he looked outside.  He testified that he saw a person wearing a red baseball cap bent over.  He ran to get dressed, but by the time he returned, the person was gone.

Anna Dillon, Mr. Dillon's wife, testified that she heard "a scream followed by a thud" after the motion detector lights came on. She ran to her living room and looked out. She saw a parked car with the dome light on. She testified that someone was behind the steering wheel facing the rear of the car and leaning over the back part of the front seat while pushing something down. She explained that after the person got through pushing downward, the person quickly turned around and drove the car away at a high rate of speed.

Johnnie Rose, who lived near Mr. Holland, testified that he was getting home from work and was walking to his door when he saw Ms. Sanderson's car go by his house. He saw another car, of a dark color and shaped like a Beretta, turn around in a driveway and head down the street on which Mr. Holland lived. He saw Ms. Sanderson get out of her car and walk toward Mr. Holland's house. By this time, the other car had parked in front of Mr. Holland's house. Mr. Rose then entered his own house. When he returned outside a short time later, the car in front of Mr. Holland's house was gone, but Ms. Sanderson's car remained in the driveway. When shown a photograph of a maroon Beretta, Mr. Rose testified that the photograph "look[ed] like" the car he saw.

Jimmy Daniels, a Memphis police officer, testified that he found two buttons near Ms. Sanderson's car in Mr. Holland's driveway. These buttons were introduced into evidence and resembled those later found on the jacket Ms. Sanderson had been wearing that night.

Alonzo Jeans was driving a bus in Eudora, Mississippi at about 6:40 a.m. on April 19 when he saw a car backing into a driveway off of Highway 301. He stated that he had never before seen anyone pulling in or out of that driveway and that it had "been a while" since anyone had lived in that house. In his statement to the Tennessee Bureau of Investigation (T.B.I.), Mr. Jeans described the vehicle as a small burgundy car driven by a white male. When shown the photograph of a maroon Beretta, he testified that it was the car he saw in the driveway.

Marshall Mullins testified that on May 9, 1996, several weeks after Ms. Sanderson's disappearance, he and his sister were visiting some property their father owned in Eudora, Mississippi. On the property was an abandoned house. As Mr. Mullins was walking by the house, he noticed an odor. His sister then found a new shoe on the ground on the side of the house. Mr. Mullins saw another shoe on the back side of the house. He then looked in a little storage room on the back side of the house and saw a female leg, from the mid-thigh down. Mr. Mullins then called the police.

Jeffrey Pounders, the county coroner, went to the location where the body was found. He testified that it was "very decomposed." He stated that he saw no jewelry on the body, only clothes. Robert Sanderson, Ms. Sanderson's husband, identified the clothes recovered from the body as those worn by Ms. Sanderson on the night of April 18, 1996. Dr. Pounders sent the body to be autopsied.

Dr. Steve Hayne performed the autopsy on the body. He testified that the body was in a state of advanced decomposition, and opined that the "decedent died from a single gunshot wound striking the right side of the head." Dr. Hayne recovered no jewelry from the body, but he recovered a small

caliber copper jacketed bullet from the skull. Tommy Heflin, with the T.B.I. forensic crime laboratory, identified the bullet recovered from the skull as a "twenty-five caliber fired full metal case bullet," probably shot from a 25-caliber semi-automatic pistol.

Dr. Harry Mincer, an expert in the area of forensic odontology, testified that he examined the teeth in the victim's skull and determined that they matched the dental x-rays taken of Ms. Sanderson in 1994. He further testified that the victim's upper right front tooth had been knocked out; that the bone in front of the upper right front tooth had been fractured and broken away; that the tooth next to it had been chipped; and that bone had been cracked and sprung toward the front. He opined that these injuries occurred near the time of death.

Dr. Steven Symes, a forensic anthropologist, testified that he examined the skull and found two types of trauma: a gunshot wound, and a blunt trauma. He explained that "at least one major blow to the face" could have created the numerous fractures he found, including identical fractures to both sides of the victim's jaw; a pair of fractures in the base of the skull; fractures of tooth sockets in the upper right-hand-side area; a fracture of an upper tooth; fractures of the bone that holds the upper teeth; fractures in the eye orbits; and fractures to the roof of the mouth. Dr. Symes opined that the blunt trauma occurred before the gunshot wound.

On May 21, 1996, Rolando Ramirez was working at the U.S. Customs inspection table at the Port of Entry in Laredo, Texas. The Defendant and another person were entering the United States from Mexico and hesitated as they approached the inspection table. Mr. Ramirez testified that they looked "kind of ragged and beat up," and their hesitation raised his suspicions, so he stopped them and requested their identification. The Defendant gave Mr. Ramirez his driver's license. Mr. Ramirez walked away to "run the license" and when he returned, the Defendant was gone.

On May 22, 1996, Javier Gonzalez was working the border patrol in Hebronville, Texas for the Immigration and Naturalization Services. He saw a maroon Beretta take a suspicious turn, and he pulled it over. The Defendant was driving and appeared to be "very agitated." Gonzalez told the Defendant to get out of the car. The Defendant did so, pulling a knife on Gonzalez. Gonzalez drew his gun and subdued the Defendant. After handcuffing the Defendant, Gonzalez removed $1,480 from the Defendant's rear pockets, including fourteen one hundred dollar bills.

Federal Bureau of Investigation (F.B.I.) Agent Evan Rea picked the Defendant up in Laredo, Texas on May 22, 1996, arrested him and processed him from his detention by the border patrol. The Beretta was secured at the border patrol checkpoint. The car was registered to the Defendant's wife, Sharon Powers. When Ms. Powers came out to recover the car, she gave Agent Rea permission to search it. During his search he obtained three "lint rolls" from the rear of the car. He obtained these items by rolling a lint remover across the rear seat and the rear floors, capturing hair and fibers.

Chris Hopkins of the F.B.I. testified as an expert in the field of trace evidence. He testified that he compared the hairs and fibers taken from the victim's clothing to the hair and fibers taken

from the Beretta on the lint rolls. He testified that he found a black wool fiber from one of the lint rolls which was consistent with the victim's clothing. However, he found no hairs from the lint rolls which were consistent with those from the victim.

Roberto Elizondo of the Webb County, Texas Sheriff's Department testified that he transported the Defendant from jail to the infirmary in late September 1996. While at the infirmary recovering from surgery, the Defendant attempted to escape. Mr. Elizondo was successful in recapturing the Defendant before he got outside.

Sharon Powers, the Defendant's wife, testified that the Defendant left their house on the evening of April 18, 1996 to go to a casino. He was wearing a yellow shirt, a blue denim jacket, blue jeans, a red ball cap, and white tennis shoes. He left in her maroon Beretta car. She next saw the Defendant at about 9:30 the next morning. She testified that the Defendant was wearing the same clothes, that he was "kind of wired up," and that he told her he had won a lot of money. She stated that he "was acting really nervous," "doing kind of strange things like going to the blinds and peeking out." He showed her a lot of money in his wallet and gave her a one hundred dollar bill. When he stated that he wanted to take a shower, she became suspicious that he was having an affair because he usually went straight to bed upon coming home after gambling. She testified that when she questioned him

> [h]e told [her] that he had . . . seen a woman win a lot of money, and he followed her out of the casino, and he followed her to her home, and he drug her -- he got her out of her car and drug her down the driveway, and put her into the back seat of [his] car, and took her to an abandoned house, and robbed and killed her. Shot her.

Ms. Powers also testified that the Defendant explained to her that he had seen the victim at Sam's Town while he was upstairs looking down at the blackjack table at which the victim was playing. The Defendant told Ms. Powers that after he followed the victim home, she parked in the driveway, and he parked at the curb. When Ms. Powers asked how he kept the victim in the back seat of the Beretta, the Defendant said "he put the fear of God in her." He told Ms. Powers that he drove to a building, moved the victim to the trunk of the car, and then drove to Mississippi where he shot, killed and robbed her. He then went behind the Splash Casino and threw the gun and the victim's purse into the river. The Defendant told Ms. Powers that he had stolen between $4,000 and $5,000 from the victim. Ms. Powers testified that when the Defendant returned home on the morning of April 19, the Beretta had been washed and the interior cleaned.

Ms. Powers testified that upon hearing that the Defendant had robbed and killed the victim, Ms. Powers testified, she became "hysterical" and told the Defendant to take his clothes and throw them in different dumpsters which, she said, the Defendant did. That evening, the Defendant, Ms. Powers and Ms. Powers' two sons went to Harrah's Casino, not far from Sam's Town. Ms. Powers testified that the Defendant had wanted to return to Sam's Town but that she talked him out of it. As they got ready to leave Harrah's they noticed a security patrol car driving by the Beretta very slowly. The Defendant told Ms. Powers to go get the car, which she did. They then left the casino.

Ms. Powers stayed home the next day. She testified that she did not call the police about what the Defendant had told her because she was scared of him and scared that she would be "a part of this." That night she saw a news report on television about the abduction of Ms. Sanderson. Ms. Powers panicked; the Defendant packed some clothes, told her there was some money in the back yard, and told her that if anyone asked, he was going to his mother's in Murfreesboro, Tennessee. The Defendant then left.

After the Defendant left, Ms. Powers went to visit her friend, Margaret York. She told Ms. York what the Defendant had told her and then decided that she had to call the police. She called the police department and told an officer, "I think my husband might have been involved in the abduction of that woman in Memphis." She testified that she wanted the Defendant to be caught, but that she did not want to be the one responsible. She explained that she was in love with the Defendant at the time.

Ms. Powers testified that the Defendant returned home after about a week. He left early the next morning, first writing a note stating that he was leaving because he was unhappy in the marriage. Ms. Powers testified that the Defendant wrote this note to mislead the authorities. Before he left, the Defendant told Ms. Powers that the victim's rings were behind the B & W Lounge. The Defendant also dug up some money he had buried in the back yard and tried to give some of it to her. Ms. Powers refused to take it, so the Defendant instead gave her some money out of his wallet. Ms. Powers testified that the Defendant kept the money he dug up and left in the Beretta.

Ms. Powers testified that the last time she saw the Defendant was in Laredo, Texas where she went to pick up the Beretta in June or July of 1996. She stated that the Defendant was in jail. One or two days after returning home, Ms. Powers met with F.B.I. Agent Jennifer Eakin. Ms. Powers testified that Ms. Eakin gained her trust, and she told Ms. Eakin everything the Defendant had told her about the crime. Ms. Powers subsequently testified to the grand jury. When shown a photograph obtained from surveillance videos taken at Sam's Town on the night of April 18, 1996, Ms. Powers identified the Defendant as the person in the photograph.

On cross-examination, Ms. Powers admitted that her initial statements to the police were inaccurate. She testified, "I didn't give a true and correct statement until I met with Ms. Eakins." She also admitted that she wrote a letter to the Defendant after he was in custody in which she lied, telling him that she had testified about his actions to the grand jury because she had been threatened with prosecution. She explained that she wrote the letter because she wanted him to tell the truth and because she did not want him to know that she was the one who initially went to the police. She reiterated her fear of the Defendant. Ms. Powers also admitted that at the time she married the Defendant she was receiving Social Security benefits due to a prior marriage and did not inform the Social Security office of her remarriage. She also lied to the Defendant when she told him that these checks had been cut off.

Ms. Powers testified that the Defendant had received a tax refund of about $3,800 prior to April 18, 1996, but she did not know how much of that money he still had. She admitted that for

Mother's Day in May 1996, the Defendant sent her a card containing $600. Ms. Powers also admitted that the F.B.I. gave her $4,000 and explained that this money was to reimburse her for damages to her car caused by their search and for relocation expenses.

On redirect examination, the prosecution introduced a portion of the letter which the Defendant wrote to Ms. Powers in response to her letter. The portion of the letter which was admitted into evidence states:

> Now I'll come to the point of this letter. I told the detectives on Tuesday & then Steve on Wednesday that before I make any decision on this, I would like to be able to see you & talk to you face to face. The reason is that I want to know what <u>ALL</u> you told them so that if I see there's no hope for me I want to be able to protect you & get them off your back with their threats. If I cooperate with them, they will want to know <u>everything</u> and I don't want to tell them anything which might differ from what you told them.

Margaret York, Ms. Powers' friend with whom she had discussed these events, was unavailable to testify at trial due to ill health. Accordingly, her deposition was taken prior to trial, and portions of her deposition were read to the jury. Ms. York testified that she lived near the Defendant and Mrs. Powers and knew them both. She testified that on the afternoon of April 19, 1996, the Defendant came to her home and asked her if she would say that he was there with her if anyone asked about his whereabouts. She testified that she replied, "I guess so, I don't know, I will have to think about it. I guess I could if you didn't kill anybody." She stated that she laughed when she said this, but "his expression didn't change." The Defendant left her house shortly after this exchange.

The next night, Ms. York saw a newscast reporting Ms. Sanderson's disappearance. Ms. Powers then came to Ms. York's home, and after a conversing with Ms. Powers, Ms. York told her to call the police, which Ms. Powers did. Ms. York stated that she saw the Defendant again two to three weeks later. He came to Ms. York's home and cried and said he was going to have to leave. He talked about his whole family leaving and offered to take Ms. York with them. Ms. York stated that Ms. Powers was present during this visit and appeared frightened for the Defendant.

F.B.I. Agent Jennifer Eakin testified that she was assigned to this case in June 1996. She initially interviewed Margaret York and then interviewed Sharon Powers. Her initial meeting with Ms. Powers was on June 27 at the Clarksdale, Mississippi Police Department and lasted approximately four hours. During that meeting, she testified, Ms. Powers told her what her husband had said about the murder. That afternoon, Ms. Eakin, Ms. Powers and three other officers went to the B & W Lounge to look for Ms. Sanderson's rings. The rings were found inside an old abandoned couch behind the tavern. The rings were wrapped in pink plastic wrap and then wrapped in foil. Jennifer Baldridge, the victim's sister, and Robert Sanderson, the victim's husband, identified these rings as belonging to the victim.

Ms. Eakin testified that she met with Tom Scott, the Director of Surveillance at Sam's Town Hotel and Gambling Hall, in July 1996. Ms. Eakin told Mr. Scott to review the surveillance videotapes made at the casino on the night of April 18, 1996 and she told him what to look for in the videos based on what Ms. Powers had told her: what the Defendant had been wearing, how he had observed Ms. Sanderson from the second floor as she played blackjack, and how he followed her in the casino. To assist Mr. Scott in his work, Ms. Eakin gave him a laser copy of the Defendant's driver's license photograph, which was recent.

Ms. Eakin testified that the F.B.I. gave Ms. Powers $4,000 to reimburse her for the damage to her Beretta and to help her relocate. She stated that Ms. Powers was "extremely frightened" of the Defendant. Ms. Eakin opined that the $4,000 probably did not cover all of Ms. Powers' expenses. She also stated that Ms. Powers never inquired about the $10,000 reward which had been offered in conjunction with Ms. Sanderson's disappearance.

Ms. Eakin denied ever threatening Ms. Powers with prosecution, but stated that she told Ms. Powers "that remaining silent on such a matter might subject her to the scrutiny of law enforcement." Ms. Eakin also testified that she told Ms. Powers that "keeping the secret actually put her in greater jeopardy from [the Defendant]."

Ms. Eakin testified that she requested that the rings and the plastic wrap and foil in which the rings had been wrapped be tested for the Defendant's fingerprints. She also testified that she requested that the money found in the Defendant's possession be checked for Ms. Sanderson's prints. She stated that no usable fingerprints were found on any of these items. There were also no fingerprints of value found on Ms. Powers' Beretta. However, Chris Hopkins, the F.B.I. trace evidence expert, compared the pink plastic wrap found around the rings with a roll of pink plastic wrap taken from the Defendant's home and concluded that the chemical compositions and colors of the two samples were the same. He stated that it was of "great" significance that the colors, parent polymer and additives were the same.

R. D. Roleson, a Memphis police officer, testified that he participated in the search for the murder weapon and for the victim's purse in the area where the Splash Casino had been. He stated that neither of these items was recovered. He testified that it was 59.3 miles from Sam's Town to Mr. Holland's house and 45.6 miles from Mr. Holland's house to the abandoned house in Eudora where the victim's body was found.

Tom Scott, the Director of Surveillance at Sam's Town Hotel and Gambling Hall, testified that the establishment had 512 surveillance cameras. Based on the information given to him by the F.B.I., Mr. Scott compiled a videotape showing a chronological series of film clips obtained from various surveillance films made on the night of April 18, 1996. This videotape was played for the jury and shows a person wearing white tennis shoes standing in an area which overlooked the blackjack table at which Ms. Sanderson was gambling. The tape subsequently shows Ms. Sanderson leaving the casino, with the person wearing the white tennis shoes leaving about thirty seconds later. Mr. Scott referred numerous times to this person as "Mr. Powers" during direct examination,

although he had never before seen the Defendant. On redirect, when the prosecutor asked Mr. Scott if he saw the person in the videotape in the courtroom, Mr. Scott identified the Defendant.

The Defendant called one witness, Rebecca Coradini. Ms. Coradini testified that she lived about two blocks from the intersection of Gherald and Riviera, near Mr. Holland's house. She was standing on her front porch at about 4:15 or 4:20 on the morning of April 19, 1996. She testified that she saw a van drive by, turn around, and come back. She then saw a red Mitsubishi[1] drive by, followed by a little maroon car. She stated that the driver of the maroon car looked like an older Caucasian man. Ms. Coradini testified that when she saw Mr. Sanderson on the news, she thought he looked like the driver of the maroon car. However, she stated on cross-examination that she was "kind of half asleep and [not] really paying attention" when she observed the cars, and she testified that she was not sure that the driver of the maroon car was Mr. Sanderson.

## FACTS: PENALTY PHASE

During the sentencing phase of the Defendant's trial, Emily Dodson testified that she was living in Rutherford County, Tennessee in 1979, when she was seventeen years old. One night shortly after graduating from high school, she was driving home. She was followed for some distance by the Defendant. When she arrived home and was getting out of her car, the Defendant "jumped in on the driver's side." Ms. Dodson began screaming, and the Defendant held a knife to her throat and told her to be quiet. The Defendant got into the passenger seat and told her to drive away. Ms. Dodson began to struggle, and the Defendant again threatened her with the knife. Ms. Dodson then told the Defendant that she had left the keys in the trunk. They got out of the car, and Ms. Dodson began fighting the Defendant again. She got the knife away from him and tried to run away. The Defendant struck her on the head with a crescent wrench, knocking her to the ground. As he swung the wrench at her again, Ms. Dodson took it away from him and hit him across the face with it. She was then able to run to her front door, and the Defendant ran off. The Defendant was subsequently apprehended, and Ms. Dodson identified him as her attacker. The Defendant pled guilty to aggravated assault.

Karen Cannon also testified on behalf of the State. In October 1980, at eighteen years of age, she was living in Murfreesboro, Tennessee. She met the Defendant at a Shoney's restaurant, and he asked her to give him a ride to get some money for gas. Ms. Cannon obliged, and on the way back, the Defendant produced a knife and broke Ms. Cannon's nose with the handle. He then stuck the knife against her side. The Defendant began telling Ms. Cannon where to go, but she managed to drive next to the county jail. She parked the car, grabbed the Defendant's hand holding the knife, and blew the horn. A police officer came to the car and apprehended the Defendant. Ms. Cannon subsequently identified the Defendant as her attacker, and he pled guilty to aggravated assault.

Eloise Gaither, the Rutherford County Court Clerk, testified and produced a certified copy of the judgment of conviction reflecting the Defendant's 1980 conviction of aggravated assault for

---

[1]The victim was driving a red Mitsubishi on the morning she was abducted.

the offense involving Ms. Dodson. She also produced a certified copy of the judgment of conviction reflecting the Defendant's 1981 conviction of aggravated assault for his attack on Ms. Cannon.

Sammy Magee, Captain of the Hinds County, Mississippi Sheriff's Office Investigation Division, testified that he investigated a robbery and aggravated assault on a seventy-four year old woman, Clyo Griffin. His investigation revealed that the Defendant entered Ms. Griffin's home, beat her with an iron skillet, and stole her jewelry, credit cards, and a pistol. The Defendant hid the jewelry and the pistol in a plastic bag and buried the items beside a tree in the next county.

Patricia Bennett was the assistant district attorney who prosecuted the Defendant for his attack on Ms. Griffin. She testified that the Defendant pled guilty in 1984 to robbery and to aggravated assault in connection with the attack, and she produced a certified copy of the transcript of the guilty plea. Barbara Dunn, the Circuit Clerk for Hinds County, Mississippi, produced copies of the records reflecting the Defendant's convictions of robbery and aggravated assault for his attack on Ms. Griffin.

Also introduced by the State was a copy of a judgment reflecting the Defendant's guilty plea and conviction of assault with a dangerous weapon on a federal officer, arising from his attack on Mr. Gonzalez, the federal immigration agent.

Caroline Holland, the paternal grandmother to the victim's three children, testified about the effect of the murder on her family. She explained that the three children lived with her and her husband and were currently ten, eight and six years old; the children had been seven, five and three when their mother was abducted. She testified that Ms. Sanderson's disappearance had been "very traumatic" for the children and that they developed a "devastating feeling of terror of people getting lost." She explained that the children had trouble sleeping by themselves and that "they miss [their mother] every day." She stated that the bond between Ms. Sanderson and her children had been "very strong" and that "[s]he loved her children dearly, and they loved her." She testified that the children still cried for their mother.

The Defendant called Pamela Bigelow, his ex-wife. Ms. Bigelow testified that she and the Defendant began dating in high school and married in 1973, when she was seventeen years old and he was eighteen years old. She testified that her mother and the Defendant had a very close relationship. She explained that the Defendant's relationship with his own mother was difficult because the Defendant's mother was Taiwanese, and there were a lot of communication problems and cultural differences between them. Ms. Bigelow testified that the Defendant came to this country when he was about ten years old, and she reported that he was very smart. She and the Defendant were married about four years and had two children. She testified that the Defendant was "very good" to her and their children and that he respected her mother very much. She described him as "quiet, withdrawn. He's very polite. . . . He's a good person. He's got good traits." She asked the jury to spare his life and to allow him to see his two grandchildren.

Following this proof, the trial court instructed the jury on three aggravating circumstances: that the Defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the Defendant or another; and that the murder was knowingly committed, solicited, directed, or aided by the Defendant, while the Defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any kidnapping.[2] The trial court further instructed the jury on specific mitigating circumstances as follows: "There has been testimony that the Defendant was forty-two years of age at the time of the offense; there has been testimony that the Defendant has low self-esteem and self-worth; there has been testimony that the Defendant has used alcohol and drugs in the past; there has been testimony that the Defendant had entered guilty pleas in each of his five previous convictions; there has been testimony that the Defendant had been previously known during a certain period of his life to have been a shy, quiet and polite individual; there has been testimony that the Defendant was never able to develop a normal mother-son relationship with his mother and had difficulty communicating with her; there has been testimony that the Defendant's ex-wife does not want him to receive the death penalty; there has been testimony that in the year 1995, the Defendant was employed; there has been testimony that the Defendant is of Asian descent and had to make cultural adjustments upon his arrival from Taiwan in this country at the age of ten."[3]

The jury returned a sentence of death for the Defendant's murder of Shannon Sanderson upon finding that all three aggravating circumstances had been established beyond a reasonable doubt and that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.

## ANALYSIS: GUILT PHASE ISSUES
## I. SUFFICIENCY OF IDENTIFICATION EVIDENCE

In his first issue, the Defendant contends that "the evidence of his identity as the culprit is insufficient" for a jury to find him guilty beyond a reasonable doubt. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176

---

[2] See Tenn. Code Ann. § 39-13-204 (i)(2), (6), (7).

[3] The trial court also apparently instructed the jury on a mitigating circumstance involving "love and support for him." However, the copy of the jury charge included in the record is missing the remaining language used by the court in delivering this specific instruction.

(Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

In light of our standard of review, we find the evidence of the Defendant's identity as the murderer and robber sufficient to support his convictions. Ms. Powers testified that the Defendant confessed to her that he kidnapped, robbed and murdered the victim. The Defendant was apprehended driving Ms. Powers' maroon Beretta, which contained a fiber matching the clothing worn by the victim on the night of her abduction. The victim's rings were recovered in the location described to Ms. Powers by the Defendant. Surveillance videos from the Sam's Town casino place the Defendant in the victim's proximity at the time she won $5,000 and show him leaving the casino thirty seconds after she did. Mr. Rose testified that he saw a maroon Beretta in front of Mr. Holland's house, and Mr. Jeans saw a maroon Beretta in the driveway of the abandoned house where the victim was found. The victim obtained her winnings in one hundred dollar bills and fourteen one hundred dollar bills were found on the Defendant at the time of his capture. This evidence is sufficient to prove that the Defendant was the perpetrator of the crimes of which he was convicted. This issue is without merit.

## II. VARIANCE BETWEEN INDICTMENT AND PROOF

The Defendant next contends that his murder conviction should be reversed because of a material variance between the indictment charging him with murder and the proof presented at trial. Specifically, the indictment alleges that the Defendant "in Shelby County, Tennessee, . . . did unlawfully and knowingly kill SHANNON SANDERSON during the perpetration of Robbery." However, the proof at trial established that the Defendant killed Ms. Sanderson in Mississippi. The Defendant argues that this variance between the indictment and the proof is sufficiently material and prejudicial to require us to overturn his conviction and dismiss the indictment. We respectfully disagree.

Our supreme court has adopted the following test for determining whether the variance between an indictment and the proof at trial is material:

> Unless substantial rights of the defendant are affected by a variance, he has suffered
> no harm, and a variance does not prejudice the defendant's substantial rights (1) if

the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993) (quoting State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984)). Here, the only variance between the indictment and the proof is the location at which the murder was committed. In the context of indictments, the place of the offense is typically considered a matter of form rather than of substance. See State v. Nixon, 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997) (finding that defects in an indictment which go to matters of form rather than substance include the place of the offense); See also State v. Sowder, 826 S.W.2d 924, 928 (Tenn. Crim. App. 1991) ("The indictment need not be specific regarding the time or place of the offense."). Indeed, it is not necessary that the indictment even aver the location of the offense, so long as the proof at trial demonstrates facts bringing the offense within the jurisdiction of the charging county. Tenn. Code Ann. § 40-13-208.

The Defendant makes no allegation that he was in any way surprised, much less prejudiced, by the proof at trial that he murdered the victim in Mississippi. There is no allegation that he was misled by the variance or that he was in any way unable to prepare his defense as a result of the variance. Nor does he allege that he is subject to double jeopardy because of the variance. The Defendant was charged with murdering Ms. Sanderson. Had he been acquitted of the charge, principles of double jeopardy would prevent the State of Tennessee from prosecuting him a second time on the basis that he committed the murder in Mississippi rather than in Shelby County, Tennessee. See U.S.Const. amend. V (stating that no person "shall . . . be subject for the same offense to be twice put in jeopardy of life or limb"); Tenn. Const. art. I, § 10 (stating that "no person shall, for the same offense, be twice put in jeopardy of life or limb.") Thus, given that the Defendant has not demonstrated that his substantial rights were affected by the variance, we find this issue to be without merit.

### III. JURISDICTION

The Defendant next contends that Tennessee was without jurisdiction to prosecute him for the robbery and murder of Ms. Sanderson because both crimes were committed in the State of Mississippi. Again, we must respectfully disagree.

Our criminal code provides that "[w]hen the commission of an offense commenced within this state is consummated outside its boundaries, the offender is liable to punishment in this state in the county where the offense was commenced." Tenn. Code Ann. § 39-11-103(c). We do not disagree with the Defendant that the proof at trial established that he consummated the aggravated robbery and felony murder of Ms. Sanderson in Mississippi. However, so long as these offenses were commenced within Shelby County, Tennessee, then the courts of that county had jurisdiction to prosecute him for those crimes. Id; see also Tenn. R. Crim. P. 18(d) ("[O]ffenses committed

wholly or in part outside this state, under circumstances that give this state jurisdiction to prosecute the offender, may be prosecuted in any county in which an element of the offense occurs.")

The word "commence" is defined as follows: "[t]o initiate by performing the first act or step. To begin, institute or start." Black's Law Dictionary 268 (6th ed. 1990). In the context of a criminal offense, a perpetrator commences a crime when he or she completes at least one of the elements which constitute the crime. The crime of robbery has three elements: (1) the intentional or knowing theft of property, (2) from the person of another, (3) by violence or putting the person in fear. Tenn. Code Ann. § 39-13-401(a). A robbery becomes aggravated when the accused accomplishes the robbery with a deadly weapon, or where the victim suffers serious bodily injury. Id. § 39-13-402(a). Because aggravated robbery requires that the accused take the victim's property from the victim's person, the offense requires some physical proximity between the perpetrator and the victim.[4] One may commence the crime of aggravated robbery, therefore, by achieving this physical proximity and putting the person in fear. For instance, a perpetrator may commence an aggravated robbery by confronting a pedestrian and wielding a knife. If the pedestrian is standing in Tennessee near the Kentucky border and is able to flee into Kentucky before the perpetrator grabs him and removes his billfold from his pocket, then Tennessee would have jurisdiction over the perpetrator.

Similarly, in this case, the Defendant commenced an aggravated robbery of Ms. Sanderson in Shelby County, Tennessee when he accosted her in Mr. Holland's Memphis driveway and forced her into the back seat of the Beretta by, in his own words, "put[ting] the fear of God in her." Accordingly, the court in which the Defendant was tried had jurisdiction to prosecute the Defendant for aggravated robbery.[5]

Under the same facts, the court had jurisdiction to prosecute the Defendant for murder in the perpetration of a robbery. First degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2). Thus, while a felony murder is typically consummated upon the killing of the victim, it may be commenced upon the commencement of the underlying felony. In this case, the underlying felony was commenced in Tennessee; hence, the Shelby County trial court had jurisdiction to prosecute the Defendant for felony murder. Accordingly, this issue is without merit.

## IV. MARITAL PRIVILEGE

---

[4]Cf. State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991) ("Every robbery, by definition, involves some detention against the will of the victim, if only long enough to take goods or money from the person of the victim.")

[5]That the Defendant's actions in forcing the victim into the backseat of his car and then driving away with her into another state would also have sustained a kidnapping conviction, see State v. Anthony, 817 S.W.2d at 306, does not change our analysis.

-14-

In his next issue, the Defendant argues that the trial court erred in permitting his wife, Sharon Powers, to testify about his description to her of his crimes against Ms. Sanderson. At the time of this prosecution, Tennessee's statutory marital communications privilege provided, in pertinent part, that "[i]n either a civil or criminal proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects." Tenn. Code Ann. § 24-1-201(b)(Supp. 1998).[6] The Defendant objected to the admissibility of his confession to Ms. Powers by filing a motion in limine prior to trial. The trial court denied the Defendant's motion on the basis that the communication did not satisfy the four criteria for defining a "confidential communication between married persons" as set forth in State v. Hurley, 876 S.W.2d 57, 63 (Tenn. 1993). The Defendant contends that Hurley has no application to the statute and that the trial court thereby erred in relying upon it. The Defendant argues that because he intended his confession to Ms. Powers to have been confidential, the trial court should have granted his motion in limine.

Prior to 1995, Tennessee's marital communications privilege in criminal cases was based on common law. See generally Hurley, 876 S.W.2d at 61-62; see also McCormick v. State, 186 S.W. 95, 97 (Tenn. 1916). The privilege was created to foster "the sacredness of the home and the peace of families." McCormick, 186 S.W.2d at 97. To be privileged, the communication must have been "confidential" in nature. State v. Price, 46 S.W.3d 785, 800 (Tenn. Crim. App. 2000). To meet the definition of confidential, an interspousal communication had to satisfy four criteria: (1) the communication must have originated in confidence that it would not be disclosed; (2) the element of confidentiality was essential to the full and satisfactory maintenance of the marriage; (3) the marriage must have been one which, in the opinion of the community, ought to have been sedulously fostered; and (4) the injury that would inure to the marriage by disclosure of the communication must have been greater than the benefit thereby gained for the correct disposal of litigation. Hurley, 876 S.W.2d at 63 (quoting Adams v. State, 563 S.W.2d 804, 808 (Tenn. Crim. App. 1978)).

Prior to 1993, either spouse could exercise the privilege with respect to a confidential marital communication; that is, a criminal defendant could assert the privilege and keep his or her spouse from testifying against him or her. See Price, 46 S.W.3d at 800. In 1993, our supreme court changed this common law rule in State v. Hurley, 876 S.W.2d at 64 . In Hurley, our supreme court held that only the testifying spouse had the right to exercise the privilege and refuse to testify. Id. As this Court has previously recognized, the legislature reacted to the holding of Hurley by making the privilege available to either spouse. See Price, 46 S.W.3d at 801. The Defendant argues that the legislature's 1995 enactment of a statute setting forth the marital communications privilege which makes no mention of the four criteria for confidential marital communications effectively abrogates their applicability.

However, this Court has previously rejected this argument, finding that by adopting a statutory marital confidential communications privilege in criminal cases,

---

[6]The statute was amended in 2000, to incorporate the four-part test discussed herein. See Tenn. Code Ann. § 24-1-201(c)(1) (Supp. 2000).

the General Assembly gave no indication that it intended to change the common law marital communications privilege beyond changing the rule in State v. Hurley and ensuring that the privilege can be invoked by either the testifying or the non-testifying spouse.

Id. Accordingly, this Court held in Price that a marital communication must still satisfy the four requirements set forth in Adams before it will be considered confidential and subject to the privilege. Id; see Adams, 563 S.W.2d at 808.

In this case, the trial court addressed the four criteria and found that the Defendant's initial confession to his wife was made "with the expectancy of confidentiality"; that because Ms. Powers told other people the substance of the confession, the element of confidentiality was not essential to the full and satisfactory maintaining of the spousal relationship; that, given Ms. Power's pre-trial testimony about the Defendant's physical and emotional abuse of her and her children, the relationship was "beyond extremely tumultuous" and not one which was "worthy of being sedulously fostered"; and that, given Ms. Powers' pre-trial testimony that the marriage was substantively over,[7] the injury to the marriage by Ms. Powers' testimony was "minimal", while the benefit gained for the correct disposal of the prosecution was "very significant." Thus, the trial court found, only one of the criteria for establishing a confidential marital communication was satisfied, and the Defendant could therefore not assert the privilege.

We find no error in the trial court's determination that the marital communications at issue in this case were not privileged. The testimony adduced at the pre-trial hearing on the Defendant's motion in limine supports the trial court's findings, and this issue is therefore without merit.

## V. ADMISSIBILITY OF EVIDENCE TO SHOW THIRD PARTIES' MOTIVES TO MURDER THE VICTIM

The Defendant next claims that the trial court violated his constitutional right to present a complete defense. The Defendant attempted to introduce proof that Robert Sanderson, Brian Maher and Brett Musekamp each had a motive to kill Ms. Sanderson. Specifically, defense counsel proffered testimony from Brian Maher that he and Ms. Sanderson had been having an affair that she broke off on April 16, 1996, two days before her disappearance. The gist of Maher's testimony was that he and Ms. Sanderson had been lovers for approximately two months when she came by his place of employment and ended their romantic relationship; that he was "[k]ind of relieved [by the break-up] because [he] had already started seeing someone else"; and that Ms. Sanderson had told him that she was afraid of her husband, unhappy in her marriage to him, and that she "wanted out". Maher denied killing Shannon Sanderson. The trial court refused to admit any of this testimony, ruling that this evidence was irrelevant.

---

[7]Ms. Powers admitted that she had not filed for divorce from the Defendant, but explained that, due to her fear of the Defendant, she had not done so in order to avoid disclosing to him the name of the state in which she was living.

Defense counsel also proffered the testimony of Brett Musekamp. Musekamp testified that he had known Ms. Sanderson for about fourteen years and that they "used to date." When Mr. and Ms. Sanderson began dating, Musekamp wrote Mr. Sanderson a letter, "[t]rying to keep them from dating." Musekamp testified that the letter made Mr. and Ms. Sanderson angry, and they brought charges against him "trying to keep [him] away from seeing her." Musekamp denied that he had been following Ms. Sanderson or that he had threatened her. He testified that he last saw Ms. Sanderson three to four months prior to her disappearance. Again, the trial court ruled this testimony inadmissible as irrelevant.

During the cross-examination of Mr. Sanderson, defense counsel sought to question Sanderson about a post-nuptial agreement he had entered into with Ms. Sanderson on April 3, 1996, which required him to pay her $10,000 in the event of their divorce, and about his knowledge of Maher and Musekamp. The trial court ruled this proof inadmissible as irrelevant.

The Defendant also proffered the testimony of Mark Burchfield, who had been employed at Sam's Town on the night of Ms. Sanderson's disappearance. Mr. Burchfield testified that he saw Robert Sanderson in the casino that night. He also stated that Ms. Sanderson had come to him asking for his assistance because Robert Sanderson was angry with her and because she was afraid of him. Finally, the Defendant wanted Jennifer Baldridge, Ms. Sanderson's sister, to testify that when she initially approached Sanderson for a photograph of Ms. Sanderson for the purpose of putting out fliers about Ms. Sanderson's disappearance, Sanderson refused to cooperate. The trial judge also ruled this proof inadmissible as irrelevant.

The Defendant contends that in ruling all of this proof inadmissible, the trial court violated his Fourteenth Amendment right to "be afforded a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984). We respectfully disagree.

We note first that the admissibility of testimony is within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a clear showing of abuse. State v. Carruthers, 35 S.W.3d 516, app. 575 (Tenn. 2000). We acknowledge, however, that "an accused is entitled to present evidence implicating others in the crime." Id. Commonly referred to as a "third party defense," an accused has the right to show that others had a motive to murder the victim. State v. Spurlock, 874 S.W.2d 602, 612 (Tenn. Crim. App. 1993); State v. Kilburn, 782 S.W.2d 199, 204 (Tenn. Crim. App. 1989). Such evidence must conform to the general rules governing the admissibility of evidence and must be of the sort that would be admissible against the third party at his or her trial. Carruthers, 35 S.W.3d at app. 575. "Accordingly, hearsay evidence implicating another individual would not be admissible." Id. Moreover,

> [t]o be admissible, the evidence must be such proof as directly connects the third party with the substance of the crime, and tends clearly to point out someone besides the accused as the guilty person. Evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible.

State v. Peck, No. 958, 1991 WL 154534, at *7 (Tenn. Crim. App., Knoxville, Aug. 15, 1991).

Here, the Defendant sought to prove that three other persons had motives to kill Ms. Sanderson: Brian Maher, a recently spurned lover; Brett Musekamp, a prosecuted ex-boyfriend; and Robert Sanderson, a cuckolded husband contractually obligated to give the victim $10,000 in the event of their divorce. However, all of the proof of Ms. Sanderson's alleged fear of her husband was based on hearsay and was therefore inadmissible for that reason alone. See Tenn. R. Evid. 802. The remaining excluded testimony would have done no more than cast bare suspicions or raise conjectural inferences as to Ms. Sanderson's murderer. Certainly, the Defendant proffered no proof whatsoever of the actual commission of the murder by any of his three other "suspects." Rather, the proof in this case established that the Defendant confessed to the murder, and numerous corroborating circumstances entitled the jury to conclude that his confession was true. The Defendant offered no proof which directly connected a third party with the substance of the crime, and he offered no proof which tended clearly to point out someone besides himself as the perpetrator. Accordingly, we find that the trial court did not abuse its discretion in finding the proffered evidence irrelevant and inadmissible. This issue is therefore without merit.

## VI.  IDENTIFICATION TESTIMONY

During the course of his testimony explaining the surveillance videotapes taken at Sam's Town casino on the night of April 18, 1996, Tom Scott repeatedly referred to the person seen in the tapes as "Mr. Powers." Mr. Scott did not know the Defendant; rather, he referred to the person as "Mr. Powers" on the basis of information provided to him by the F.B.I. Accordingly, the Defendant objected to Mr. Scott's identification of him as based on inadmissible hearsay. The trial court overruled the Defendant's objection, and the Defendant now argues that the trial court's ruling was error.

We agree with the Defendant that Mr. Scott should not have been allowed to refer to the person shown in the tapes as "Mr. Powers." "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Tenn. R. Evid. 602. Mr. Scott admitted that he had no personal knowledge of the Defendant's appearance or identity and that his knowledge of the Defendant's identity was based on information provided to him by the F.B.I. Accordingly, the trial court erred in overruling the Defendant's objection.

During the State's redirect examination of Mr. Scott, the prosecutor asked him to identify whether any person in the courtroom was the person shown in the videotape. Over defense counsel's objection, the trial court allowed Mr. Scott to testify that the person in the videotape was the Defendant. We agree with the Defendant that the prosecutor's question called for an opinion from a lay witness.

Our Rules of Evidence provide that a lay witness's testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). Certainly, Mr. Scott's testimony that the

person in the tape was the Defendant was "rationally based" on Mr. Scott's perception of the similarities between the photographs and the Defendant's person in the courtroom. Id. However, Mr. Scott's opinion about the identity of the person in the tape was not necessary to a clear understanding of his testimony, nor was it helpful in the determination of a fact in issue. While the Defendant's identity as the man in the tape was certainly an issue in the trial, Mr. Scott was in no better position to identify that person as the Defendant than were the jurors: Mr. Scott had no more past familiarity with or knowledge of the Defendant than did they. Thus, we find that the trial court erred in permitting the State to seek Mr. Scott's opinion on this issue.

Nevertheless, we find both of the trial court's errors regarding Mr. Scott's testimony to be harmless. The jurors saw the videotape and had the Defendant before them; each juror therefore had the opportunity to determine for her or himself whether the person in the video was the Defendant. Mr. Scott admitted that he did not know the Defendant and admitted that his identification was based on hearsay information. Moreover, Ms. Powers viewed a still photograph made from the surveillance tapes and identified the person therein as the Defendant. Ms. Powers was certainly qualified to testify as to the Defendant's identity, and we are confident that the jury gave far more weight to her testimony than it did to Mr. Scott's. Accordingly, we find this issue to be without merit.

## VII. ADMISSIBILITY OF MARGARET YORK'S DEPOSITION

The Defendant contends that the trial court erred by admitting portions of Margaret York's testimony taken by deposition in Mississippi. Ms. York's testimony was taken by deposition because of her ill health. After receiving a copy of the transcript, defense counsel noticed that the court reporter who administered the oath and transcribed the deposition identified herself in the Court Reporter's Certificate as "Court Reporter and Notary Public, Shelby County, Tennessee." Similarly, the title underneath her signature on the Certificate states, "Court Reporter and Notary Public for the State of Tennessee at Large." Defense counsel thereupon objected to the use of the deposition at trial on the grounds that the court reporter was not authorized by Mississippi law to administer the oath and take the deposition. See Tenn. R. Civ. P. 28.01 ("[D]epositions shall be taken before an officer authorized to administer oaths by the laws . . . of the place where the examination is held . . . . "). The trial court denied the Defendant's motion to strike the deposition.

We are unable to reach the merits of this issue because the record is inadequate. While we acknowledge that the court reporter identified herself in the transcript of the deposition as a Tennessee court reporter and notary public, there is nothing in the record to demonstrate that she was not also authorized to administer oaths by the laws of Mississippi. The Defendant supplied neither the trial court nor this Court with any proof in support of his allegation that the court reporter was not properly authorized to administer oaths in Mississippi, other than the certificate she affixed to the transcript of the deposition. It is certainly possible that the court reporter was also a notary public

in Mississippi and thereby authorized to administer oaths in that state,[8] but simply used the wrong title when preparing the certificate. We decline to speculate about the court reporter's authority, and we note that the applicable rule requires that the officer taking the deposition be properly authorized to administer oaths, but does not require the officer's certification to reflect that authority. See id. Furthermore, even if the trial court erred in admitting the deposition, its admission was clearly harmless in light of the overwhelming evidence of guilt.

## ANALYSIS:  SENTENCING PHASE ISSUES
## VIII.  ADMISSIBILITY OF FACTS UNDERLYING PRIOR VIOLENT FELONIES

The Defendant contends that the trial court erred in allowing the State to introduce proof about the underlying facts leading to his prior convictions of three aggravated assaults and a robbery.[9] One of the aggravating factors relied upon by the State in seeking the death penalty is established where "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2).  However, our supreme court has deemed it error "to admit evidence regarding specific facts of the crime resulting in the previous conviction, when the conviction on its face shows that it involved violence or the threat of violence[10] to the person." State v. Bigbee, 885 S.W.2d 797, 811 (Tenn. 1994) (footnote added), superceded by statute as stated in State v. Stout, 46 S.W.3d 689 (Tenn. 2001).  Thus, the Defendant argues, the trial court erred in permitting the State to adduce testimony about the facts and circumstances of his prior violent felonies.

Prior to the sentencing hearing, the State explained to the trial court that it intended to introduce the facts underlying the prior felonies under a post-Bigbee amendment to the relevant statute.  Effective May 7, 1998, Tennessee's death penalty statute was amended to provide that
> [i]n all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction.

---

[8]See Miss. Code Ann. § 25-33-9.

[9]Two of these aggravated assaults occurred in Tennessee; the third aggravated assault and the robbery occurred in Mississippi.

[10]The statutory aggravating circumstance applicable to defendant Bigbee's trial was established where "[t]he defendant was previously convicted of one or more felonies, other than the present charge, which involve the use or threat of violence to the person." Tenn. Code Ann. § 39-2-203(i)(2) (1982) (emphasis added).  The aggravating circumstance applicable to the Defendant's trial does not include the language pertaining to the threat of violence. See Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1996).  This portion of the Bigbee analysis is, therefore, no longer applicable.

Tenn. Code Ann. § 39-13-204(c) (Supp. 2000).  The trial court deemed the testimony admissible under this amendment.  The Defendant now contends that the amendment is not applicable to offenses committed prior to May 7, 1998.

We first note that the Defendant did not object to the applicability of this statute at trial, and this issue is therefore waived.  See Tenn. R. App. P. 36(a); Grandstaff v. Hawks, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000) ("A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal.")  Nevertheless, we agree with the Defendant that the legislative amendment allowing the introduction of proof establishing the facts underlying previous convictions was not applicable to his sentencing hearing.
Our criminal code provides that
> [w]henever any penal statute or penal legislative act of the state is . . . amended by a subsequent legislative act, any offense, as defined by the statute or act being . . . amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.  Except as provided under the provisions of § 40-35-117, in the event the subsequent act provides for a lesser penalty, any punishment imposed shall be in accordance with the subsequent act.

Tenn. Code Ann. § 39-11-112.  The amendment at issue here does not provide for a lesser penalty, but rather provides for the admissibility of certain evidence.  Thus, the Defendant was required to be prosecuted under the statute as it existed in April 1996.  See State v. Smith, 893 S.W.2d 908, 919 (Tenn. 1994) (noting that "[g]enerally, a criminal offender must be sentenced pursuant to the statute in effect at the time of the offense").  At that time, the relevant statute made no reference one way or the other to the admissibility of facts underlying prior violent felonies.  See Tenn. Code Ann. § 39-13-204(c) (Supp. 1996).  Bigbee, however, held that the admission of such facts could be error, 885 S.W.2d at 811.

Bigbee's prescription against admitting the facts underlying previous felonies was limited to those convictions which showed on their face that they involved violence to the victim.  See id.[11] In Tennessee, aggravated assault involves either serious bodily injury to the victim, or the use or display of a deadly weapon.  See Tenn. Code Ann. § 39-13-102(a).  Thus, our supreme court has recently acknowledged that aggravated assault does not necessarily involve the use of violence to another person.  See State v. Sims, 45 S.W.3d 1, 10-12 (Tenn. 2001).  In Sims the court noted that aggravated assault "may be committed by intentionally or knowingly causing the victim to reasonably fear imminent bodily injury by use or display of a deadly weapon."  Id. at 10-11 (footnote omitted).  Similarly, a person commits aggravated assault in Mississippi "if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon . . . ."  Miss. Code Ann. § 97-3-7(2).  Thus, an aggravated assault can be committed in Mississippi that does not involve

---

[11]In Bigbee, the defendant's prior conviction was for first degree murder, clearly a conviction showing on its face that it involved violence to the victim.

violence to another person.  Similarly, a person commits robbery in Mississippi if he "feloniously take[s] the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person."  Id. § 97-3-73.

The Bigbee court acknowledged that where the prior conviction does not demonstrate on its face that it involved violence to the person, then, "[e]vidence of facts regarding a previous conviction to show that it in fact involved violence . . . to the person is admissible at a sentencing hearing in order to establish the aggravating circumstance."  Bigbee, 885 S.W.2d at 811 (emphasis added).  Accordingly, the evidence was admissible under Bigbee.

The evidence was admissible under another theory, as well.  The State was interested in introducing this proof not just to establish as an aggravating factor that the Defendant had committed prior violent felonies, but also to establish a second aggravating factor:  that the Defendant killed Ms. Sanderson in order to avoid, interfere with, or prevent his arrest or prosecution.  See Tenn. Code Ann. § 39-13-204(i)(6).  During closing argument, the State repeatedly made the point that the prior victims identified the Defendant as their attacker, thereby leading to his convictions.  This time, the State reasoned, the Defendant intended to avoid another conviction by eliminating his witness.  The admission of the facts underlying the prior violent felonies is proper under these circumstances.  See State v. Stout, 46 S.W.3d 689, 702 (Tenn. 2001) ("[T]he prosecutor's intent was not to unfairly increase the weight of the prior violent felony aggravating circumstance, but rather to establish an entirely separate aggravating circumstance that it was relying upon, [that the killing was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another]. . . . Accordingly, we conclude that the evidence and argument did not affect the jury's determination to the prejudice of the defendant.")  This issue is without merit.

### IX.  WHETHER THE DEFENDANT'S PRIOR CONVICTIONS WERE ADMISSIBLE TO ESTABLISH THE AGGRAVATING CIRCUMSTANCE FOR PRIOR VIOLENT FELONIES

The trial court instructed the jury at the close of the sentencing hearing that the Defendant's prior convictions for aggravated assault, robbery and assault on a federal officer with a dangerous weapon were all felonies "involving the use of violence to the person."  The Defendant now contends that these five offenses "were not crimes whose statutory elements involve the use of violence to the person" and that the trial court thereby erred in allowing these offenses to be used in satisfaction of the prior violent felonies aggravating circumstance.  See Tenn. Code Ann. § 39-13-204(i)(2) (setting forth an aggravating circumstance where the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person).  The Defendant argues that since these crimes could be committed without the use of violence to the person, they cannot be used to satisfy the prior violent felonies aggravating circumstance.  Accordingly, the Defendant maintains that the evidence in support of this circumstance is insufficient.

-22-

As set forth above, aggravated assault and robbery (both the Tennessee and Mississippi versions) can be committed without involving the use of violence to another person.  However, in addressing the very argument that the Defendant makes in this case, our supreme court has held:

> [i]n determining whether the statutory elements of a prior felony conviction involve the use of violence against the person for purposes of § 39-13-204(i)(2), we hold that the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements of that felony may be satisfied either with or without proof of violence.  To hold otherwise would yield an absurd result . . . .  A plain reading of the statute indicates that the legislature intended to allow juries to consider a defendant's prior violent crimes in reaching a decision during the sentencing phase of a first degree murder trial.

State v. Sims, 45 S.W.3d at 11-12.  Thus, the court held, where the underlying facts of the prior felony demonstrate that the defendant committed the crime by using violence against the victim, the prior convictions were admissible as prior violent felonies within the meaning of the statutory aggravating circumstance.  Id.

The proof in this case demonstrated that the Defendant's prior felony convictions of aggravated assault and robbery all involved the use of violence against his victims.  The trial court was therefore correct in concluding that these prior offenses fit within the meaning of the statutory aggravating circumstance and submitting them to the jury.  We further find that the trial court was correct in concluding that the federal offense involved the use of violence.  The Defendant was convicted of assault on a federal officer with a dangerous weapon.  That crime is committed when the accused "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties."  18 U.S.C.A. § 111(a)(1).  Black's Law Dictionary defines "violence," in pertinent part, as "[u]njust or unwarranted exercise of force."  Black's Law Dictionary 1570 (6th ed. 1990).  Thus, we conclude that the use of the term "forcibly" in this statute indicates that the elements of this crime involve the use of violence to the person.  Moreover, even if we were to conclude that this prior felony did not involve the use of violence to the person, because the proof at trial established that the Defendant merely approached Mr. Gonzalez with a knife, but did not actually use it on him, we would find any error in submitting this prior felony to the jury to be harmless beyond a reasonable doubt.  The proof in support of the remaining four prior violent felonies was more than sufficient to entitle the jury to find that the State had established this aggravating circumstance beyond a reasonable doubt.  This issue is, therefore, without merit.

### X.  SUFFICIENCY OF EVIDENCE ESTABLISHING THAT THE DEFENDANT COMMITTED THE MURDER TO AVOID HIS ARREST AND/OR PROSECUTION

The jury found as a second aggravating circumstance that the Defendant killed Ms. Sanderson "for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another."  Tenn. Code Ann. § 39-13-204(i)(6).  The Defendant contends that this conclusion is "based solely on speculation."  We respectfully disagree.

In order to establish this aggravating factor, the State does not need to prove that the defendant's desire to avoid arrest or prosecution was his sole motive in murdering the victim, "so long as it is one of the motives in the killing." State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000); see also Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001) ("We do not require that the desire to avoid arrest or prosecution be the sole motive for killing the victim. Instead, such a desire need only be one of the purposes motivating the defendant to kill.") In this case there was abundant proof that the Defendant killed Ms. Sanderson to avoid his apprehension: he took her to an abandoned house in a different state from whence he had abducted her; he killed her and left her body in a place unlikely to be discovered; he initially lied to his wife about the source of the funds he took from the victim; he hid the proceeds of his crimes; he twice fled his home to avoid being found; and he thrice tried to evade the authorities, once by use of a deadly weapon. Clearly, the Defendant was determined not to be caught and convicted again. His multiple prior convictions were the result of his victims being able to identify him. The jury in this case was entitled to weigh all of this evidence and determine if the State had established, beyond a reasonable doubt, that the Defendant killed the victim to avoid his arrest and/or prosecution. The jury so determined, and the proof is sufficient to support its conclusion. This issue is, accordingly, without merit.

## XI. ADMISSIBILITY OF VICTIM'S CHARACTER EVIDENCE

The Defendant wanted to introduce evidence about the victim's "bad character." The trial court ruled that the Defendant had the right to rebut victim impact evidence introduced by the State, but that the Defendant would not be permitted "to call witnesses regarding relationships [the victim] may have had or fights she may have had with former boyfriends or things of that sort." The Defendant now complains that the trial court erred in limiting his proof about the victim.

The Defendant offers this Court no legal authority for the proposition that he was entitled to submit proof that the victim's character in this case was, in appellate counsel's words, "not without blemish." Accordingly, this issue is waived. See Ct. Crim. App. R. 10(b). Moreover, our supreme court has determined that "evidence of the defects in the victim's character . . . is not relevant mitigating evidence and [is therefore] properly excluded." State v. Teague, 680 S.W.2d 785, 788 (Tenn. 1984). We do not think that our current death penalty sentencing scheme, or cases dealing with the admissibility of victim impact evidence, change this holding. Furthermore, we fail to see how such evidence would have been relevant during the sentencing phase of the Defendant's trial. The Defendant did not know the victim, and any prior behavior on her part had absolutely no impact on his decision to murder her. The victim impact evidence was limited to the effect Ms. Sanderson's death had on her children; therefore, evidence of her extramarital affair and/or difficulties in her marriage to Mr. Sanderson certainly would not have been appropriate rebuttal evidence to this testimony. Nor was it "relevant mitigating evidence such as the defendant's character, record, or the circumstances of the offense." Id. In short, we see no abuse of discretion by the trial court in refusing to admit evidence of the victim's "bad character." This issue is, therefore, without merit.

## XII. CONSTITUTIONALITY OF TENNESSEE'S DEATH PENALTY

The Defendant contends that Tennessee's death penalty provisions are unconstitutional for a number of reasons, but concedes that these challenges have been previously rejected by our supreme court. Thus, he raises these issues to preserve them for later review. Specifically, he contends: (1) our death penalty scheme fails to meaningfully narrow the class of death eligible defendants; (2) the death penalty is imposed capriciously and arbitrarily; and (3) the appellate review process in death penalty cases is constitutionally inadequate. These arguments have been rejected by our supreme court. See, e.g., Terry v. State, 46 S.W.3d at app. 169-171. Accordingly, we find these issues to be without merit.

## XIII. PROPORTIONALITY REVIEW

In reviewing the Defendant's sentence of death for first degree murder, this Court must conduct a comparative proportionality review to determine whether the Defendant's sentence of death for first-degree felony murder "'is disproportionate to the sentences imposed for similar crimes and similar defendants.'" Id. at 163 (quoting State v. Bland, 958 S.W.2d 651, 664 (Tenn. 1997)); see also Tenn. Code Ann. § 39-13-206(c)(1)(D). The purpose of this review is to ensure that the death penalty is applied consistently and not arbitrarily or capriciously. Terry, 46 S.W.3d at 163. "The presumption is that a sentence of death is proportional to the crime of first degree murder, as long as sentencing procedures focus discretion on the '"particularized nature of the crime and the particularized characteristics of the individual defendant.'" Id. (citations omitted). In conducting this review, we look to other cases in which the defendant committed the same or similar crimes, considering the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. Id. at 163-64.

In this case, the Defendant abducted a young mother from her former father-in-law's driveway by "put[ting] the fear of God in her," stuffing her into the backseat of his car and later transferring her to the trunk of his car. He drove her to a remote area in another state, where help was virtually impossible. He robbed the victim of her money and jewelry, delivered at least one powerful blow to her mouth, and shot her in the head, leaving her body hidden and unlikely to be found. He eventually confessed his crimes to his wife and then left his home to avoid apprehension, first hiding the spoils of his crimes. He offered no cooperation to the authorities and expressed no remorse for his actions. The Defendant has a history of violent crimes.

The Defendant is of Asian descent and was forty-two years old at the time he murdered Ms. Sanderson. He was first convicted of a violent felony in 1980. He has some history of drug and alcohol abuse, although there was no evidence that he was under the influence of either drugs or alcohol at the time he committed these crimes. He was employed in 1995, but was using gambling as a source of income in 1996. He has been married twice and has two children by his first wife. He moved to this country from Taiwan at the age of ten. The Defendant committed these crimes while on parole from a sentence for a prior violent felony.

In State v. Stout, 46 S.W.3d 689 (Tenn. 2001), the defendant and his accomplices abducted a young woman from her driveway, forced her into the backseat of her car, drove her to a remote area, and shot her once in the head. Id. at 693-99. The defendant and one of his accomplices took a suitcase from the victim's car and left the area, leaving the victim behind. Id. at 693. The defendant was convicted of first degree felony murder, especially aggravated kidnapping and especially aggravated robbery. Id. at 692. He was sentenced to death on the basis of three aggravating circumstances: that he had prior convictions of violent felonies, that he had committed the murder to avoid his arrest and/or prosecution, and that he committed the murder while committing any robbery or kidnapping. Id.

In State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000), the defendant and his cohorts accosted two young men on the street, robbing them of three dollars. Id. at 915-16. The defendant then shot one of the victims. Id. The defendant was convicted of first degree felony murder and especially aggravated robbery. Id. He was sentenced to death on the basis of a single aggravating factor: that he had previously been convicted of a violent felony. Id. at 914.

In State v. Burns, 979 S.W.2d 276 (Tenn. 1998), the defendant and his accomplices approached a car parked in a residential driveway in which four young men were sitting. Id. at 278. After robbing the victims, the defendant and others opened fire. Id. The defendant shot and killed one of the men in the car and one of his accomplices shot and killed another of the men. Id. The defendant subsequently fled to Chicago. Id. The defendant was convicted of two counts of felony murder and received a death sentence for one of the murders. Id. at 277. As an aggravating circumstance, the jury found that the defendant had knowingly created a great risk of death to two or more persons other than the victim murdered. Id.

In State v. Bates, 804 S.W.2d 868 (Tenn. 1991), the defendant pled guilty to first degree murder and grand larceny and was sentenced to death. Id. at 871, 883. The defendant was on escape status from Kentucky when he abducted the victim, a young woman, as she jogged near an interstate exit. Id. at 872. He took her into some nearby woods, tied her to a tree and gagged her, and shot her once in the head. Id. He then hid her body and stole her car and traveler's checks. Id. He eventually confessed to the crimes. Id. at 873. The jury found three aggravating circumstances: that the defendant had prior convictions for violent felonies, that he killed the victim to avoid his prosecution for his escape and the theft of her car, and that he committed the murder while kidnapping and robbing the victim. Id. at 882.

In State v. Carter, 714 S.W.2d 241 (Tenn. 1986), the defendant and his accomplice abducted a man at an interstate rest stop, shot him to death, rolled his body over a cliff and stole his pick-up truck. Id. at 243. The defendant was convicted of first degree murder and sentenced to death. Id. at 242. The jury found two aggravating circumstances: that the defendant committed the murder to avoid or prevent his arrest and/or prosecution, and that he committed the murder while committing larceny and kidnapping. Id.

Based on our review of these cases in which the death penalty was upheld, we conclude that the death sentence imposed on the defendant for his felony murder of Ms. Sanderson was neither disproportionate to the penalty imposed in similar cases, nor arbitrarily applied.

## XIV. DEFENDANT'S STATUS AS A RANGE III OFFENDER

At the sentencing hearing on the Defendant's aggravated robbery conviction, the trial court found the Defendant to be a Range III offender and applied seven enhancement factors in determining the Defendant's sentence: that the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; that he treated the victim with exceptional cruelty during the commission of the offense; that he has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; that he employed a firearm during the commission of the offense; that the aggravated robbery resulted in the death of another person and that the Defendant has previously been convicted of a felony that resulted in bodily injury; that, during the commission of the aggravated robbery, the Defendant willfully inflicted bodily injury upon another person, or his actions resulted in the death of or serious bodily injury to a victim or a person other than the intended victim; and that the felony was committed while the Defendant was on parole. See Tenn. Code Ann. § 40-35-114 (1), (5), (8), (9), (11), (12), (13). The trial court found an "absence of any compelling mitigating factors." Accordingly, the trial court sentenced the Defendant to the maximum sentence provided for in his range. The trial court further ordered the Defendant's sentence for the aggravated robbery to run consecutively to his death sentence. The only aspect of the trial court's ruling with which the Defendant takes issue is its finding that he is a Range III offender. He contends, and the State concedes, that he is a Range II offender.

We agree. Range III sentences are applied to "persistent offenders." See id. § 40-35-107(c). A defendant is classified as a persistent offender if he or she has received
> (1) [a]ny combination of five (5) or more prior felony convictions within the conviction class or higher, or within the next two (2) lower felony classes, where applicable; or
> (2) [a]t least two (2) Class A or any combination of three (3) Class A or Class B felony convictions if the defendant's conviction offense is a Class A or B felony.

Id. § 40-35-107(a). "Prior convictions" are those for offenses "occurring prior to the commission of the offense for which the defendant is being sentenced." Id. § 40-35-107(b)(1). Because the Defendant's federal conviction arose out of an offense committed after his aggravated robbery of Ms. Sanderson, this conviction does not satisfy the definition of a "prior conviction" in the context of classifying him as a persistent offender. And, although the aggravated robbery is a Class B felony, see id. § 39-13-402(b), the Defendant's two prior Tennessee convictions for aggravated assault are Class C felonies. See id. § 40-35-118.[12] Likewise, the Defendant's two prior Mississippi

---

[12]The Defendant's two prior Tennessee convictions for aggravated assault occurred in 1980 and 1981.

convictions for aggravated assault and robbery would be considered Class C felonies. See id., § 40-35-107(b)(5); 40-35-118.[13]  Thus, the Defendant is not a persistent offender.

The Defendant does, however, satisfy the definition of "multiple offender" because he has received four prior felony convictions within the next two lower felony classes of the aggravated robbery.  See id. § 40-35-106(a).  Thus, the Defendant should have been sentenced as a Range II offender. See id. § 40-35-106(c).

The Range II sentence for aggravated robbery, a Class B felony,[14] is "not less than twelve (12) nor more than twenty (20) years."  Id. § 40-35-112(b)(2).  The record in this case supports the trial court's application of at least three of the enhancement factors:  that the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;[15] that he treated Ms. Sanderson with exceptional cruelty during the commission of the aggravated robbery; and the offense was committed while the Defendant was on parole.[16]  See id. § 40-35-114(1), (5), (13).  Regardless of the applicability of the remaining enhancement factors, the maximum sentence for aggravated robbery is appropriate upon the finding of three enhancement factors and no mitigating factors. See, e.g. State v. Faron Douglas Pierce, No. E1999-02210-CCA-R3-CD, 2000 WL 1705190, at *4 (Tenn. Crim. App., Knoxville, Nov. 15, 2000).  Accordingly, we modify the Defendant's sentence for his aggravated robbery conviction to the maximum sentence available for a Range II offender, which is twenty years.

The Defendant does not challenge the trial court's ruling that this sentence be served consecutive to his death sentence.  The trial court imposed consecutive sentences on the basis that the Defendant is an offender whose record of criminal activity is extensive; and that he is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high.  See Tenn. Code Ann. § 40-35-115(b)(2), (4).  We find no plain error in the trial court's imposition of consecutive sentences on these grounds and so decline to address this issue further.

**CONCLUSION**

---

[13]These convictions occurred in 1984.

[14]See Tenn. Code Ann. § 39-13-402(b).

[15]To be established as a Range II offender, the Defendant needed only two prior felony convictions. See Tenn. Code Ann. § 40-35-106(a)(1).  The Defendant has two prior Tennessee aggravated assault convictions, occurring in 1980 and 1981.  These convictions are Class C felonies. See id. § 40-35-118.  The Defendant's prior Mississippi convictions of aggravated assault and robbery are therefore additional to those necessary to establish the appropriate range.

[16]Garth Tindle, of the Mississippi Department of Corrections, testified that the Defendant was on parole on April 18 and 19, 1996.

We have carefully reviewed the record of this case and the issues raised by the Defendant. We have further conducted a proportionality review of the sentence of death imposed upon the Defendant. Finding no reversible error in the guilt phase of the trial; finding that the death penalty is proportionate to the crime, that it was neither arbitrarily nor capriciously applied; finding that the evidence supports the jury's finding of the three aggravating circumstances; and finding that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances, we affirm the Defendant's convictions and sentence of death. Finding that the trial court erred in sentencing the Defendant as a Range III offender, we reduce his sentence for the aggravated robbery to twenty years as a Range II offender. In all other respects, the judgment of the trial court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE